**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIL DENHA, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:26-cv-575 |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| BELLRING BRANDS, INC., DARCY HORN DAVENPORT, and PAUL RODE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Danil Denha ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief are based upon the investigation of Plaintiff's counsel, which included, among other things, review and analysis of: (1) regulatory filings made by BellRing Brands, Inc. ("BellRing" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) wire and press releases published by the Company; (3) analyst and media reports concerning BellRing; and (4) other publicly available information regarding Defendants (defined below).  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired BellRing securities between November 19, 2024 and August 4, 2025, inclusive, and were damaged thereby (the "Class Period").  Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) BellRing, (ii) the Company's Chief Executive Officer ("CEO") Darcy Horn Davenport ("Davenport"), and (iii) the Company's Chief Financial Officer ("CFO") Paul Rode ("Rode").

2.      BellRing develops, markets, and sells "convenient nutrition" products such as ready-to-drink ("RTD") protein shakes, powders, bars, and other protein enriched food products, primarily under the brand name Premier Protein.  The Company relies on third-party manufacturers to make its products, which it sells to consumers through club stores, grocery stores, pharmacies, mass retailers, e-commerce, online and specialty retailers, and convenience stores.

3.      BellRing recognizes revenue when control of its products passes to the customer, which typically occurs upon shipment or delivery in accordance with the applicable customer arrangement.

4.      In recent years, the convenient nutrition market has grown significantly as consumers increasingly seek simple, on-the-go ways to add protein and incorporate nutrition into their daily routines.  Products like RTD shakes, once primarily targeted at fitness enthusiasts, have become more mainstream, appealing to a broader consumer base.  As a result, these products are now widely available across club, grocery, mass, and online retailers, driving heightened competition within the category.  BellRing's competitors include a mix of established brands, small emerging brands, and retailer-owned brands.

5.      Previously, supply constraints heavily impacted BellRing's financial results. Demand exceeded manufacturing capacity, often leaving the Company unable to fully meet retailer demand.  However, in 2024, prior to the start of the Class Period, BellRing expanded manufacturing capacity by adding more third-party manufacturing partners.  According to Defendants, the new manufacturing capacity allowed the Company to implement certain "demand drivers" for the first time in years.

6.      This case arises from Defendants' misrepresentations regarding the strength, sustainability, and drivers of BellRing's sales growth, as well as the impact of competition on the demand for the Company's products.

7.      During the Class Period, Defendants represented that sales growth reflected increased end-consumer demand, attributing results to "organic growth," new "demand drivers," "distribution gains," "incremental promotional activity," and "[s]trong macro tailwinds around protein" which was "driving robust long-term growth[.]"    At the same time, Defendants

downplayed the impact of competition on demand for its products, insisting that the Company was not experiencing any significant changes in competition, and that in the RTD category particularly, BellRing possessed a "competitive moat," given that "the ready-to-drink category is just highly complex" and the products are "hard to formulate."

8.    In truth, BellRing's reported sales during the Class Period were due to its key customers stockpiling inventory, which concealed the erosion of the Company's market share as competition intensified, and did not reflect increased end-consumer demand or brand momentum. Customers had accumulated excess inventory as a safeguard against product shortages that had previously constrained BellRing's supply.  Once customers gained confidence that product shortages were a thing of the past, they promptly reduced their inventory by selling through existing products and cutting back on new orders.  Following the destocking, the Company further admitted that competitive pressures were materially weakening demand.

9.    On May 6, 2025, Defendant Rode revealed that "several key retailers lowered their weeks of supply on hand, which is expected to be a mid-single-digit headwind to our third quarter growth," adding "[w]e now expect Q3 net sales growth of low single digits[.]"  Defendant Davenport revealed that retailers had been "hoarding inventory to make sure that they didn't run out of stock on shelf" and "protecting themselves coming out of capacity constraints."  She further revealed that since there had been "several quarters of high in-stock rates" customers "felt comfortable about bringing [inventory] down.  We thought this could happen."  Davenport then assured investors that demand for BellRing's products remained strong despite the sales growth headwinds, stating, there is "no softness, no concern around consumption," without any hint of competition.

10.    On this news, the price of BellRing stock fell $14.88 per share, or 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume.

11.    Then, on August 4, 2025, BellRing reported its 3Q 2025 financial results and "narrowed its fiscal year 2025 outlook for net sales," a move the market viewed as a negative signal about the Company's sales momentum.

12.    The next day, during the Company's August 5, 2025 earnings call to discuss the quarterly financial results, Defendant Davenport attributed the disappointing new sales outlook to competitive headwinds. First, she noted, "it is not surprising to see new protein RTDs enter[ed] the [convenient nutrition] category, especially in its biggest channel cloud." When Jeffries LLC analyst Kaumil S. Gajrawala asked, "given all of the statistics and all the things that you talked about [such as] the momentum that you have . . . why [are you] narrowing [the guidance] as opposed to maybe pushing towards the high end[,]" Davenport revealed that although BellRing had secured new inventory space with a large club retailer, "several other competitors gained . . . space as well. So we're assuming this increases some competitive pressure in club[.]"

13.    On this news, the price of BellRing stock fell $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  BellRing stock trades on the New York Stock Exchange ("NYSE"), which is situated in this District, and acts and conduct that constitute the violations of law asserted herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

18.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff is Danil Denha.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased BellRing securities during the Class Period and has been damaged thereby.

20.     Defendant BellRing is incorporated under the laws of Delaware with its principal executive offices located in St. Louis, Missouri.  BellRing's common stock trades on the NYSE under the symbol "BRBR."

21.     Defendant Davenport is and was the Company's CEO at all relevant times.

22.    Defendant Rode is and was the Company's CFO at all relevant times.

23.    Defendants Davenport and Rode (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    BellRing is a consumer-packaged goods company focused on "convenient nutrition," best known for its RTD protein shakes, powders, bars, and other protein enriched food products.   The Company's most important brand is Premier Protein, which accounts for approximately 85% of sales.   BellRing distributes its products through club stores (such as Costco and Sam's Club), grocery stores, pharmacies, mass retailers (such as Wal-Mart), e-commerce, online and specialty retailers, and convenience stores.

25.    BellRing operates an asset-light business model, relying on third-party manufacturers to produce its products, and emphasizes brand investment, innovation, and channel expansion to drive sales growth.   Its business performance is closely tied to trends in protein

consumption, pricing and mix, retailer inventory dynamics, and promotional activity. The Company recognizes revenue when control of its products passes to its customers, typically upon shipment or delivery in accordance with the applicable customer arrangement.

26.    BellRing regularly reports "consumption" and "shipments" as key metrics to help investors distinguish true end-consumer demand from retailer inventory activity not necessarily driven by underlying changes in consumer demand, such as stocking—when retailers increase on-hand inventory through accelerated purchases—or destocking—when retailers reduce inventory by selling through existing product and curtailing reorders.

27.    In recent years, the convenient nutrition market has grown rapidly as more consumers seek quick and easy ways to add protein to their daily routines. Rising awareness of the importance of protein in fitness and overall health has fueled demand for protein enriched products across retail channels, leading to their increased availability in club, grocery, mass, and online stores. This broader availability has also intensified competition, as more brands enter the space.

28.    In the years prior to the start of the Class Period, BellRing's financial results were largely shaped by supply constraints. Demand often exceeded manufacturing capacity, meaning the Company often struggled to produce enough products to fully meet retail orders. However, in early 2024, BellRing expanded manufacturing capacity by adding and ramping additional third-party manufacturing partners, including partners that built brand new facilities largely dedicated to producing the Company's products.

29.    Prior to the start of the Class Period, BellRing told investors its new manufacturing capacity allowed the Company to focus on driving demand, including implementing certain demand drivers for the first time since 2021. For instance, during BellRing's February 6, 2024

earnings call to discuss its 1Q 2024 financial results, Defendant Davenport stated, "[t]he business continues to accelerate as we bring on new shake capacity and begin to drive demand" and during BellRing's May 7, 2024 2Q 2024 earnings call, Davenport stated, "[f]or the first time since 2021, we executed 2 successful club promotions in 1 quarter, which sparked a ton of consumer and retailer excitement."

**Defendants' False and Misleading Statements Issued During the Class Period**

30.     The Class Period begins on November 19, 2024.  After the close of trading on November 18, 2024, BellRing reported its 4Q and fiscal year 2024 financial results in a press release that the Company filed on Form 8-K with the SEC.  The next day, November 19, 2024, BellRing filed its Form 10-K Annual Report with the SEC and held an earnings conference call to discuss the financial results.  In the press release, 10-K, and earnings call, Defendants touted BellRing's financial results and momentum, asserting that factors including "organic growth," "[s]trong macro tailwinds," new "demand drivers," "increased promotional activity," and "distribution gains" drove the Company's strong performance.

31.     Specifically, the press release quoted Defendant Davenport as stating:

We finished the year strong, with our results coming in at the high end of our expectations. . . .  Our momentum remains high as we enter 2025. The convenient nutrition category continues to provide strong tailwinds, with ready-to-drink shakes and powders in the early stages of growth. We have leading mainstream brands that deeply resonate with consumers, giving us confidence in the long-term prospects for our company.

32.     Also in the press release, BellRing stated, "Premier Protein net sales increased 20.3%, driven by 19.5% volume growth and 0.8% increase in price/mix.  Premier Protein RTD shake net sales increased 20.7%, driven by 19.6% increase in volume and 1.1% increase in price/mix.  Volume gains were driven by organic growth and distribution gains."

33.     In the 10-K, BellRing stated, "[s]ales of *Premier Protein* products were up $317.8 million, or 23%, driven by 25% higher volumes primarily due to increased promotional activity (which resulted in lower average net selling prices), higher RTD shake production and distribution gains."

34.     During the earnings call, Defendant Davenport stated, "[o]ur full year results for the second year in a row meaningfully exceeded our long-term algorithm as we added shake capacity and began to layer in demand drivers."   Also on the call, Davenport said, "we demonstrated that the demand [for Premier Protein] is there and will continue to grow as we layer in demand drivers" and "[s]trong macro tailwinds around protein are driving robust long-term growth in our categories with ready-to-drink and powder segments in the early stages of growth."

35.     Also during the call, Defendant Rode stated:

Premier Protein net sales grew 20%, primarily driven by strong volume growth for both RTD shakes and powders. RTD shake sales grew 21%, boosted by organic growth and distribution gains as well as a 1% benefit from our price increase taken in Q4. Shipment dollar growth outpaced consumption dollar growth with shipments benefitting from load ends of new distribution and Q1 promotions as well as replenishment of food channel shelf gaps.

36.     On February 3, 2025, BellRing reported its 1Q 2025 financial results in a press release that the Company filed on Form 8-K with the SEC.  The next day, February 4, 2025, the Company filed its Form 10-Q financial report for 1Q 2025 with the SEC and held an earnings conference call to discuss the financial results.  In the press release, 10-Q, and earnings call, Defendants touted BellRing's financial results and momentum, asserting that factors such as "organic growth," "incremental promotional activity," "strong macro tailwinds," and "distribution gains" drove the Company's strong performance.

37.     Specifically, the press release quoted Defendant Davenport as stating, "Our momentum remains high, with the convenient nutrition category continuing to drive robust growth.

Our strong start to 2025 gives us greater confidence in the full year and drove our decision to raise our outlook."

38.    Also in the press release, BellRing stated, "Premier Protein net sales increased 26.3%, driven by 21.4% increase in volume and 4.9% increase in price/mix.  Premier Protein RTD shake net sales increased 25.3%, driven by 21.3% increase in volume and 4.0% increase in price/mix.  Volume growth was driven by distribution gains and incremental promotional activity."

39.    In the 10-Q, BellRing stated, "[s]ales of *Premier Protein* products were up $96.0 million, or 26%, driven by 21% higher volumes.  Volumes increased primarily due to distribution gains and incremental promotional activity."

40.    During Defendant Davenport's prepared remarks during the earnings call, she stated, "I'm pleased to share that fiscal '25 is off to a good start.  The business accelerated as we layered in demand drivers and kicked off new campaigns[.]"  Davenport concluded her prepared remarks by stating, "[i]n closing, our Q1 results position us well for another above algorithm year.  Our organization has officially pivoted to demand driving.  Strong macro tailwinds around protein are driving robust long-term growth in our category with ready-to-drink and powder segments in the early stages of growth."

41.    Also during the call, Defendant Rode stated, "Premier Protein net sales grew 26% behind strong volume growth for RTD shakes and powders.  Distribution gains, incremental promotions and organic growth drove the sales increase as well as a benefit from a price increase on shakes taken in Q4."

42.    Later during the call, D.A. Davidson & Co. analyst Brian Patrick Holland noted that "capacity constraints are easing presumably not just for you but for the category" and that some small competitor brands are "having some nice growth," and asked, "curious how you're

seeing the competitive landscape evolve around you as maybe more capacity becomes available." In response, Defendant Davenport downplayed competition, particularly in the RTD category. She said, "[f]rom a competitive standpoint, I would say there aren't a ton of major changes since the last several quarters. . . . the ready-to-drink category is just highly complex. It's hard to formulate. It takes 2-plus years to formulate these products . . . So it's just a much different . . . competitive moat, I would say, than in the other parts of the [convenient nutrition] category."

43. The statements referenced in ¶¶30-42 were materially false and misleading. BellRing's reported sales during the Class Period were materially attributable to temporary inventory stockpiling by several of its key customers, which concealed the erosion of the Company's market share as competition intensified. Contrary to Defendants' repeated representations, the strong sales results did not reflect increased end-consumer demand or brand momentum. Instead, customers accumulated excess inventory as a safeguard against product shortages that had previously constrained BellRing's supply. Once customers gained confidence that product shortages were a thing of the past, they promptly reduced their inventory by selling through existing products and cutting back on new orders. Following the destocking, the Company admitted that competitive pressures were materially weakening demand.

### The Truth Emerges

44. On May 5, 2025, BellRing reported its 2Q 2025 financial results in a press release the Company filed on Form 8-K with the SEC, and held an earnings conference call the following day, May 6, 2025, to discuss the results. During the earnings call, Defendant Rode revealed that beginning in 2Q 2025, "several key retailers lowered their weeks of supply on hand, which is expected to be a mid-single-digit headwind to our third quarter growth." Rode also revealed, "[w]e now expect Q3 net sales growth of low single digits[.] Without the impact of these trade inventory

changes, our underlying third quarter [sales] growth for Premier Protein RTD shakes would be more in line with our expected consumption growth of mid- to high teens." Rode also stated that BellRing was expanding promotions to boost sales to "offset [] third quarter reductions in retailer trade inventory levels."

45.     Analysts questioned whether the destocking indicated weakness in demand for BellRing's products. For example, JPMorgan Chase & Co. analyst Kenneth B. Goldman said about the destocking, "[i]t's fairly substantial in size . . . when it's that substantial, typically, it doesn't happen unless there is . . . either deceleration in consumption or disappointment in consumption from the retailer side" and asked "[a]re you hearing anything along those lines from your retailers about why they're really pulling back . . . typically, we really don't see deloads happen unless it's on the consumption side as well." In response, Davenport stated:

> So this is really tied to retail -- so specifically one, but a couple of retailers holding on kind of protecting themselves coming out of capacity constraints. They were a little bit hoarding inventory to make sure that they didn't run out of stock on shelf. And then we've now showed over several quarters of high in-stock rates and so they felt comfortable about bringing them down. We thought this could happen. We just had no idea when it would happen. And so – and we're seeing it.

However, she continued to misrepresent the strength of demand for BellRing's products, concluding her answer by adding, "[b]ut absolutely, no softness, no concern around consumption."

46.     On this news, the price of BellRing stock declined $14.88 per share, or 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume.

47.     Then, on August 4, 2025, after market hours, BellRing reported its fiscal 3Q 25 financial results in a press release that it filed on Form 8-K with the SEC and held an earnings conference call the following morning, August 5, 2025, to discuss the results. In the press release,

the Company revealed a disappointing new 2025 sales outlook, stating "BellRing management has narrowed its fiscal year 2025 outlook for net sales to [a] range between $2.28-$2.32 billion[.]"

48.     During the earnings call, Defendant Davenport attributed the disappointing new sales outlook to increased competition.  First, in her prepared remarks, Davenport stated, "[s]uccess attracts competition" and said, "it is not surprising to see new protein RTDs enter[ed] the [convenient nutrition] category, especially in its biggest channel cloud."  And when Jefferies analyst Gajrawala asked, "given all of the statistics and all the things that you talked about [such as] the momentum that you have . . . just curious why [you are] narrowing as opposed to maybe pushing towards the higher end[,]" Davenport said that while BellRing had gained new inventory space in a key club retailer, "several other competitors gained . . . space as well.  So we're assuming this increases some competitive pressure in club[.]"

49.     Also on the call, Defendant Rode acknowledged that "consumption" had not outpaced "shipments" as the Company expected in the quarter, but rather, "[t]hey came in more in line."  However, as pointed out by Jefferies analyst Gajrawala, this did not fit with the previous news that several customers were destocking.  Gajrawala stated, "I might have expected consumption to be much higher given there was some destock in the third quarter."  This is because destocking should not materially affect consumption.  Instead, shipments would be expected to decline, as retailers would need fewer replenishment orders while selling through existing inventory.

50.     On this news, the price of BellRing stock declined $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired BellRing securities during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of BellRing, and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.   Whether Defendants violated the Exchange Act;

B.   Whether Defendants omitted and/or misrepresented material facts;

C.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.   Whether the price of BellRing's securities was artificially inflated;

F.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.   The extent of damage sustained by Class members and the appropriate measure of damages.

54.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE

57.    At all relevant times, the market for the Company's common stock on the NYSE was an efficient market for the following reasons, among others:

    A.    The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    B.    As a regulated issuer, BellRing filed periodic public reports with the SEC;

    C.    BellRing regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    D.    BellRing was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the market for BellRing securities promptly digested current information regarding BellRing from all publicly available sources and reflected such

information in the price.  Under these circumstances, all purchasers of BellRing securities during the Class Period suffered similar injury through their purchases at artificially inflated prices, and the presumption of reliance applies.

59.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## NO SAFE HARBOR

60.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

61.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  During the Class Period, Plaintiff and the Class purchased BellRing securities at artificially inflated prices and were damaged thereby.  The price of the

Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of BellRing securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

62.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter because the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

63.     The Individual Defendants permitted BellRing to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

64.     The inference of the Individual Defendants' scienter is bolstered by statements made during the Class Period by the Individual Defendants themselves.  Notably, Defendant Davenport admitted BellRing knew certain "key retailers" had stockpiled inventory as a precaution against product shortages yet never mentioned this fact to investors.  Specifically, after these "key retailers" reduced their inventory beginning in 2Q 2025, Davenport said "[w]e thought this could happen" because the retailers were "hoarding inventory to make sure they didn't run out of stock on shelf" "for several quarters."  Additionally, Davenport admitted that it was "not surprising" that

new RTD competitors entered the market during the August 5, 2025 earnings call, despite previously touting the company's "competitive moat" in the RTD category.

65.    The Individual Defendants made the challenged statements specified herein either knowing that they were materially false and misleading when made, or with reckless disregard for their truth.  Given the Individual Defendants' positions within the Company and their direct involvement in and access to internal reports, metrics, and information concerning the matters addressed in their statements, the Individual Defendants knew, or were at least reckless in not knowing, that their challenged statements were inconsistent with the Company's actual financial position.

66.    BellRing's Premier Protein brand accounts for roughly 85% of the Company's total revenue.  Therefore, demand for and sales of the brand's products, including competitive pressures, are critical to BellRing's success and constitute core operations of the Company, further supporting a strong inference of scienter.

67.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding BellRing, their control over, and/or receipt and/or modification of BellRing's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BellRing, participated in the fraudulent scheme alleged herein.

68.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of BellRing securities by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding BellRing's business, operations, and management

and the intrinsic value of BellRing securities and caused Plaintiff and members of the Class to purchase the Company's securities at artificially inflated prices.

## CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

69.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

70.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BellRing securities at artificially inflated prices.

71.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially inflated market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BellRing's business, as specified herein.

73.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

75.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BellRing's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

77.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## **COUNT II**

### **Violation of Section 20(a) of the Exchange Act**
### **Against the Individual Defendants**

78.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

79.     The Individual Defendants acted as controlling persons of BellRing within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations,

and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

81.    As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of BellRing securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: January 22, 2026                    Respectfully submitted,

                                           **BLEICHMAR FONTI & AULD LLP**

                                           */s/ Javier Bleichmar*
                                           Javier Bleichmar
                                           300 Park Avenue, Suite 1301
                                           New York, New York 10022
                                           Telephone: (212) 789-1340
                                           Facsimile: (212) 205-3960
                                           jbleichmar@bfalaw.com

                                           -and-

                                           Ross Shikowitz
                                           75 Virginia Road
                                           White Plains, New York 10603
                                           Telephone: (914) 265-2991
                                           Facsimile: (212) 205-3960
                                           rshikowitz@bfalaw.com

                                           -and-

                                           Adam C. McCall (*pro hac vice* forthcoming)
                                           1330 Broadway, Suite 630
                                           Oakland, California 94612
                                           Telephone: (415) 445-4003
                                           Facsimile: (212) 205-3960
                                           amccall@bfalaw.com

                                           *Counsel for Plaintiff Danil Denha*

## <u>CERTIFICATION</u>

I, Danil Denha, hereby certify as follows:

1.       I have reviewed a class action complaint against BellRing Brands, Inc. ("BellRing") and others alleging violations of the federal securities laws and have authorized its filing.

2.       I did not purchase or sell securities of BellRing at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.       I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.       My transactions in the BellRing securities that are the subject of this litigation during the Class Period are reflected in Schedule A, attached hereto.

5.       Other than in the instant action, I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.       Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: 1/21/2026

Signed by:

Danil Denha

_____

Danil Denha

**SCHEDULE A**
TRANSACTIONS IN
BELLRING BRANDS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|:---:|:---:|---:|---:|---:|
| Purchase | 07/23/2025 | 30.00 | 55.22 | ($1,656.60) |
| Purchase | 07/23/2025 | 57.00 | 54.99 | ($3,134.43) |
| Purchase | 07/23/2025 | 191.00 | 55.22 | ($10,547.02) |
| Purchase | 07/23/2025 | 2.00 | 55.00 | ($110.00) |