UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re BELLRING BRANDS, INC. SECURITIES LITIGATION | Civil Action No. 1:26-cv-00575-JSR<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................7

BASIS OF ALLEGATIONS ....................8

PARTIES ....................9

SUBSTANTIVE ALLEGATIONS ....................12

The Company and Its Business ....................12

Defendants Had Access to, and Reviewed, Near Real-Time Data Concerning Sales, Consumer Demand, Competitor Interactions, Promotional Activity, and Market Share ....................13

At the Beginning of the Class Period, Retailers Began Temporarily Hoarding Inventory of Premier Protein ....................16

Defendants Possessed and Reviewed Circana and Numerator Data Showing that Consumption of Premier Protein Was Weakening Since at Least 1Q 2025 ....................20

Defendants Knew that Elevated and Unsustainable Promotional Activity Beginning in 2Q 2025 Masked Weakening Consumption ....................25

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................32

August 6, 2024 to May 5, 2025 (3Q 2024 - 2Q 2025): Defendants Issue Materially False and Misleading Statements About the Reasons for Growth in Retailer Inventory and Premier Protein's Sales ....................32

*Summary of Materially False and Misleading Statements* ....................32

*Relevant Pre-Class Period Statements* ....................34

*Defendants' Materially False and Misleading Class Period Statements About the Reasons that Retailers Were Increasing Inventory* ....................35

*Defendants' Materially False and Misleading Class Period Statements About the Reasons for Premier Protein's Growth in Sales* ....................41

May 6, 2025 to May 4, 2026 (2Q 2025 – 2Q 2026): Defendants Issue Materially False and Misleading Class Period Statements About Consumer Consumption and Promotional Activity ....................47

**Page**

*Summary of Materially False and Misleading Statements* ....................................47

*2Q 2025 Earnings Call and Financial Statements* ...............................................47

*3Q 2025 Earnings Call and Financial Statements* ...............................................57

*4Q 2025 and FY 2025 Earnings Call and Financial Statements*...........................62

*1Q 2026 Earnings Call and Financial Statements* ...............................................66

Defendants' Quarterly and Annual Filings Omitted Known Trends and Uncertainties in Violation of SEC Disclosure Regulations, Thereby Making BellRing's Financial Statements Materially Misleading ..................................................70

Defendants' Quarterly and Annual Filings Omitted to Include Significant Factors that Made the Investment Risky, Thereby Making BellRing's Financial Statements Materially Misleading ........................................................................74

Any Purported Risk Warnings in BellRing's Class Period Forms 10-Q and 10-K Were Inadequate ..........................................................................................79

ADDITIONAL SCIENTER ALLEGATIONS...................................................................79

Defendants Had Access to, and Reviewed, Near Real-Time Data Concerning Sales, Consumer Demand, Competitor Interactions, Promotional Activity, and Market Share.................................................................................................80

The Fraud Involved Premier Protein's Core Operations, About Which Defendants Held Themselves Out as Knowledgeable ..........................................................82

The Timing of Defendants' False and Misleading Statements Support Scienter ..............83

The Individual Defendants Knowingly or Recklessly Signed False Sarbanes-Oxley Certifications Attesting that They Personally Maintained and Promoted Effective Controls Over Financial Reporting ...............................................................84

The Individual Defendants Had Strong Financial Motives to Inflate BellRing's Stock Price Based on the Unique Structure of Their Compensation.................................85

*Davenport and Rode's Compensation* ..................................................................85

*Vitale's Compensation*...........................................................................................89

The Individual Defendants' Insider Sales During the Class Period Support Scienter ..............................................................................................................90

**Page**

Davenport Abruptly Announced Her Resignation as the Scheme Unraveled ....................93

LOSS CAUSATION/ECONOMIC LOSS ....................94

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................100

NO SAFE HARBOR ....................100

CLASS ACTION ALLEGATIONS ....................101

COUNT I ....................103

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....................103

COUNT II ....................105

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ....................105

PRAYER FOR RELIEF ....................106

DEMAND FOR TRIAL BY JURY ....................106

Lead Plaintiff Indiana Public Retirement System ("INPRS") ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, on behalf of itself and the class it seeks to represent, for its Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), alleges the following upon knowledge as to its own acts, and upon the investigation conducted by Plaintiff's counsel as detailed below.[1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons that purchased BellRing Brands, Inc. ("BellRing" or the "Company") securities between August 6, 2024 and May 4, 2026, inclusive, and were damaged thereby (the "Class Period") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Plaintiff alleges claims against: (i) BellRing, (ii) Darcy Horn Davenport ("Davenport"), the Company's Chief Executive Officer ("CEO"), (iii) Paul Rode ("Rode"), the Company's Chief Financial Officer ("CFO"), and (iv) Robert V. Vitale ("Vitale"), Chairman of the Company's Board of Directors (collectively, the "Individual Defendants").

2. BellRing is a consumer products company operating in the global convenient nutrition category. The Company has a single operating and reportable segment, with its principal products being protein-based consumer goods. Its primary brand, Premier Protein ("Premier"), accounts for approximately 86% of its total business, with ready-to-drink ("RTD") protein shakes (herein referred to as "Premier Shakes" or "RTD Shakes") comprising over 80% of total sales.

3. BellRing sells primarily through club channels including Costco, Sam's Club, and BJ's, which collectively accounted for over 50% of BellRing's sales during the Class Period.

---

[1] All emphasis is added unless otherwise noted.

Individually, Costco, Sam's Club, and BJ's represented approximately 31.3%, 19.8%, 2.5% of sales, respectively. BellRing also sells through mass retailers such as Walmart (24%) and e-commerce sites such as Amazon (9.7%). As a result, BellRing's reported sales were primarily driven by retailer ordering behavior within these channels.

4. Prior to the Class Period, supply constraints heavily impacted BellRing's financial results. Demand for BellRing's products exceeded manufacturing capacity, often leaving the Company unable to fully meet retailer demand. However, in 2024, prior to the start of the Class Period, BellRing expanded manufacturing capacity by adding additional third-party manufacturing partners. According to Defendants, the new manufacturing capacity allowed the Company to implement certain "demand drivers" for the first time in years.

5. This case arises from Defendants' misrepresentations regarding retailer and consumer demand for Premier Protein after the Company resolved its manufacturing constraints.

6. In the days leading up to the Class Period, BellRing's stock precipitously declined. Between July 8, 2024 and August 5, 2024, BellRing's stock price fell from over $60 per share on July 8, 2024 to just under $50 on August 5, 2024, an approximately 19% decline. This precipitous fall set the stage for the Defendants' stock inflation scheme, which began the next day.

7. Beginning on August 6, 2024, the first day of the Class Period, Defendants began misleading investors about retailer demand. In particular, Defendants repeatedly assured investors that retailer inventory levels were improving to "target levels," "filling the gap of trade inventory," and reaching "adequate trade inventory." These statements, however, were materially false and misleading at the time that they were made and caused an artificial inflation in the price of BellRing common stock. Nine months later, during BellRing's earnings call for the second quarter of fiscal year 2025 ("2Q 2025") on May 6, 2025, Defendants surprised the market by admitting that,

contrary to their prior statements, retailers had in fact been "a little bit hoarding inventory to make sure that they didn't run out of stock on shelf," and now "felt comfortable about bringing them down." Defendants further disclosed that this "destocking" was "expected to be a mid-single-digit headwind to our third quarter growth," and that the Defendants "now expect[ed] Q3 net sales growth of low single digits[.]" Defendants also admitted they had known about this "hoarding" trend since "last summer," "thought this could happen," but "just had no idea when it would happen."

8. On this news, the price of BellRing common stock fell $14.88 per share, or 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume.

9. Defendants' revelation about destocking sparked immediate questions from analysts during BellRing's May 6, 2025 2Q 2025 earnings call about whether there had also been declines in underlying consumer demand—otherwise known as "consumption." Defendants, however, continued to mislead investors by denying any such weakness, assuring investors that "there's really no change in consumption," "we're expecting to continue to see strong consumption," "absolutely, no softness, no concern around consumption," and "consumption remain[s] resilient and strong."

10. Unbeknownst to investors, Defendants knew, or recklessly disregarded, that these statements were materially misleading because, at the time they were made, Defendants had access to data showing that key indicators of consumer demand, including category churn, category expansion, and brand shifting, had deteriorated. Defendants also had access to data showing that BellRing was artificially propping up consumption through massive and unsustainable promotions. Defendants nonetheless hid the scope of these promotions by falsely claiming in

investor materials that there were only promotions in one month of the quarter, when in reality the Company ran unprecedented promotions for the entire quarter. BellRing common stock remained artificially inflated as consumer demand for BellRing's products was far worse than represented.

11. Over the next several quarters, the truth emerged in stages: Premier Protein's consumption was weakening, BellRing's sales growth depended on extraordinary and unsustainable promotional activity, and the Company faced substantial pressure from competitors in its core club channel.

12. On August 5, 2025, BellRing reported its financial results for the third quarter of fiscal 2025 ("3Q 2025") in a Form 10-Q and in a press release filed with the SEC on a Form 8-K on August 4, 2025 (the "August 2025 Form 8-K"), in which the Company "narrowed its fiscal year 2025 outlook for net sales," a move the market viewed as a negative signal about the Company's sales momentum. During the Company's August 5, 2025 earnings call, Davenport attributed the disappointing outlook to competitive headwinds, admitting that "it is not surprising to see new protein RTDs enter[ed] the [convenient nutrition] category, especially in its biggest channel, club." BellRing's accompanying investor presentation also revealed that the Company had relied on "major club promotions" dating back to as early as January 2025.

13. On this news, the price of BellRing stock fell $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

14. BellRing common stock nonetheless continued to trade at artificially inflated levels as Defendants continued to falsely minimize the effects of competition and their ongoing, massive, and unsustainable promotions. During the August 5, 2025 earnings call, Davenport told investors that increased club competition was "a ***unique*** scenario" involving Costco and that's why "we're

seeing the increased competition." Rode also falsely minimized the scope of BellRing's massive and unsustainable promotions by telling investors that BellRing was engaging in "***incremental*** promotional activity as we return to historical promotional levels."

15. On November 17, 2025, after market hours, BellRing reported its fourth quarter and full fiscal year 2025 ("4Q 2025" and "FY 2025") financial results in a Form 10-Q and in a press release furnished to the SEC on a Form 8-K (the "November 2025 Form 8-K"). The next day, during the November 18, 2025 earnings call, Defendants admitted that competition was increasing, that growth would slow, and that promotions were becoming problematic. Davenport stated, "[I]n the near term, we are expecting a more competitive environment," and that BellRing was setting 2026 "net sales guidance" at a "range of 4% to 8% growth." Rode admitted that consumption was negatively impacted by the Company not repeating promotions, stating: "[c]onsumption growth for Premier Protein shakes is expected to be flat" for 1Q 2026 because BellRing "chose not to repeat promotions for Premier [Protein]."

16. On this news, the price of BellRing stock declined $3.17 per share, or more than 12%, from $25.62 per share on November 17, 2025, to an intraday low of $22.45 per share on November 18, 2025, on unusually heavy trading volume.

17. Even then, Defendants continued to misleadingly reassure investors by concealing the depth of BellRing's demand and promotion problems. Davenport falsely stated that "[t]he last three quarters are much like every other quarter that we've had, which has strong, strong growth" and that BellRing had a "clear position" against competitors and was "sourcing some volume from those competitors." Davenport and Rode also continued to describe promotional activity as merely "incremental," even though BellRing's promotions were significantly outside historical and

industry norms. BellRing common stock remained artificially inflated after these disclosures because consumer demand for BellRing's products was worse than represented.

18. Defendants partially revealed more undisclosed facts in connection with BellRing's financial results for the first quarter of fiscal 2026 ("1Q 2026"). On February 2, 2026, after the close of trading, BellRing reported its 1Q 2026 financial results in a Form 10-Q and in a press release furnished to the SEC on a Form 8-K (the "February 2026 Form 8-K").

19. The next day, during the February 3, 2026 earnings call, Davenport stated that BellRing had "narrowed" its 2026 net sales guidance to 4-6% growth. Davenport attributed the reduction to "more frequent promotional events from insurgent brands than expected." Rode likewise confirmed that BellRing had "chose[n] not to repeat promotions for Premier [Protein]" from the first quarter of fiscal 2025 ("1Q 2025").

20. On this news, the price of BellRing stock declined $3.51 per share, or nearly 14%, from a close at $24.39 per share on February 2, 2026, to close at $20.88 per share on February 3, 2026, on unusually heavy trading volume.

21. BellRing common stock, however, remained artificially inflated because, among other things, Defendants continued to minimize the negative impact from competition by characterizing it as "small" and blaming softer consumption primarily on a "delay" rather than revealing the magnitude of the competition faced by the Company.

22. Defendants then finally revealed the truth in connection with BellRing's financial results for the second quarter of fiscal 2026 ("2Q 2026"). On May 4, 2026, after the close of trading, BellRing reported its 2Q 2026 financial results in a Form 10-Q and in a press release furnished to the SEC on a Form 8-K (the "May 2026 Form 8-K").

23. The next day, during the May 5, 2026 earnings call, Davenport again shocked investors by stating, among other things, that "[o]ur second quarter results came in below our expectations, and we are disappointed with our results. We faced a challenging operating environment, as multiple dynamics pressured our financial results. While net sales grew 2%, which was only modestly below expectations, the mix of our revenues differed meaningfully from both our forecast and what we've seen historically." Davenport then revealed that BellRing's consumption had long been weakening as a result of a "tremendous" amount of competition, stating: "***I think our latest estimates were internally somewhere around 40 new competitors over the last 18 months. So it's tremendous. And as the number one player, we are going to get affected by that***."

24. On this news, the price of BellRing stock declined $6.73 per share, or nearly 39%, from a close at $17.36 per share on May 4, 2026, to close at $10.63 per share on May 5, 2026, on unusually heavy trading volume.

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

26. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

## JURISDICTION AND VENUE

27. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

28. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

29. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78a(a), and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events or omissions giving rise to the claims asserted herein occurred in substantial part in this District. BellRing common stock trades in this District on the New York Stock Exchange ("NYSE").

30. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**BASIS OF ALLEGATIONS**

31. The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiff's counsel, which included reviewing and analyzing information from numerous public and proprietary sources (such as LexisNexis, Dow Jones and Bloomberg, Inc.), including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by BellRing, publicly available annual reports, press releases, published interviews, news articles and other media reports, and reports of securities analysts.

32. Many of the facts involving Defendants' wrongful conduct as alleged herein are solely in the possession of Defendants and Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PARTIES

33. Indiana Public Retirement System ("INPRS") acquired the common stock of BellRing during the Class Period and was damaged thereby, as set forth in the certification attached hereto.

34. Defendant BellRing, together with its subsidiaries, provides various nutrition products in the United States. The company offers ready-to-drink ("RTD") protein shakes, other RTD beverages, protein powders, nutrition bars, and other products primarily under the Premier Protein and Dymatize brands. It distributes its products through club stores, food, drug and mass retailers, e-commerce, online and specialty retailers, and convenience stores channels. BellRing became a public company in October 2019 and its common stock trades on the NYSE under the symbol "BRBR." The Company's fiscal year goes from October 1 to September 30 so its first quarter ends on December 31, second quarter ends on March 31, third quarter ends on June 30, and fourth quarter and fiscal year ends on September 30.

35. Defendant Darcy Horn Davenport served as the Company's President and Chief Executive Officer ("CEO") from September 2019 and as a member of the Company's Board of Directors since October 2019. Davenport previously served as General Manager of Premier Nutrition from October 2014 to November 2016 and Vice President of Marketing from October 2011 to October 2014. Prior to joining Premier Nutrition, Davenport served as Director of Brand Marketing at Joint Juice, Inc., a liquid dietary supplement manufacturer, from May 2009 to October 2011, when it combined with Premier Nutrition. On February 2, 2026, Davenport notified BellRing's Board of her retirement as President and CEO, effective on the earlier of the appointment of a new CEO or September 30, 2026. Davenport signed BellRing's annual reports filed with the SEC on Forms 10-K for fiscal years 2024 and 2025 ("FY 2024" and "FY 2025"), as well as BellRing's quarterly reports filed with the SEC on Forms 10-Q for 3Q 2024, 1Q 2025, 2Q

2025 and 3Q 2025, and certified BellRing's Class Period Forms 10-Q and Forms 10-K pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Davenport also spoke frequently to investors during BellRing earnings calls and investor conferences concerning the Company's demand trends, inventory levels, promotional activity, consumption trends, competition, and financial performance, including during BellRing's August 6, 2024 3Q 2024 earnings call, November 19, 2024 4Q 2024 and FY 2024 earnings call, February 4, 2025 1Q 2025 earnings call, May 6, 2025 2Q 2025 earnings call, August 5, 2025 3Q 2025 earnings call, November 18, 2025 4Q 2025 and FY 2025 earnings call, February 3, 2026 1Q 2026 earnings call, and May 5, 2026 2Q 2026 earnings call.

36. Defendant Paul Rode has served as the Company's Chief Financial Officer since September 2019 and serves as its principal financial officer and principal accounting officer. Rode has served as Chief Financial Officer of Post's Active Nutrition business since May 2015 and as Chief Financial Officer of Consumer Brands, a prior reporting segment of Post, from November 2014 to May 2015. Rode previously served as Vice President, Finance of Post from January 2014 to November 2014 and Vice President, Corporate Development of Post from October 2013 to January 2014. Prior to joining Post, Rode served as Vice President, Corporate Controller of Ralcorp Holdings, Inc., which was a publicly traded consumer products company and the former parent company of Post, from February 2010 to September 2013. Rode signed BellRing's annual reports filed with the SEC on Forms 10-K for FY 2024 and FY 2025 and BellRing's quarterly reports filed with the SEC on Forms 10-Q during the Class Period, including BellRing's 3Q 2024, 1Q 2025, 2Q 2025, 3Q 2025, and 1Q 2026 Form 10-Q. Rode also certified BellRing's Class Period Forms 10-Q and Forms 10-K pursuant to SOX. Rode further spoke frequently to investors during BellRing earnings calls concerning the Company's demand trends, inventory levels, promotional

activity, shipments, consumption, competition, guidance, and financial performance, including during BellRing's August 6, 2024 3Q 2024 earnings call, November 19, 2024 4Q 2024 and FY 2024 earnings call, February 4, 2025 1Q 2025 earnings call, May 6, 2025 2Q 2025 earnings call, August 5, 2025 3Q 2025 earnings call, November 18, 2025 4Q 2025 and FY 2025 earnings call, February 3, 2026 1Q 2026 earnings call, and May 5, 2026 2Q 2026 earnings call.

37. Defendant Robert V. Vitale has served as Chairman of the Company's Board since November 2024 and, before that, served as the Company's Executive Chairman from September 2019 to November 2024. Vitale has been the President and Chief Executive Officer of BellRing's former parent company, Post Holdings, Inc. ("Post"), a member of Post's board of directors, since November 2014, chairman of Post's board of directors since December 2025, and is a member of the board of directors of 8th Avenue Food & Provisions, Inc., a majority owned business of Post. He served as President and Chief Executive Officer of AHM Financial Group, LLC, a diversified provider of insurance brokerage and wealth management services, from 2006 until 2011 and previously was a partner of Westgate Equity Partners, LLC, a consumer-oriented private equity firm. Vitale signed BellRing's annual reports filed with the SEC on Forms 10-K for FY 2024 and FY 2025.

38. Defendants Davenport, Rode, and Vitale are collectively referred to herein as the "Individual Defendants." BellRing and the Individual Defendants are collectively referred to herein as the "Defendants."

39. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, taxes, services, competition, sales, and present and future business prospects. In addition, the Individual

Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

40. Each of the Defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of BellRing common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding BellRing's business, financial condition, contingent liabilities and the intrinsic value of BellRing common stock; and (ii) caused Plaintiff and other members of the Class to purchase BellRing common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

41. BellRing describes itself as a leader in the global convenient nutrition category. BellRing's primary brands, Premier Protein and Dymatize, target a broad range of consumers and compete in various product forms, including ready-to-drink ("RTD") protein shakes and powders. Its products are distributed across a network of channels including club, food, drug, eCommerce, specialty and convenience.

42. Even though BellRing offers two primary brands and several products, it is essentially a one-product company. Its principal product line — Premier Protein ready-to-drink ("RTD") protein shakes — accounts for over 80% of the Company's sales, and the Premier Protein brand as a whole accounts for approximately 86% of BellRing's revenue.

43. BellRing sells primarily through three large club retailers — Costco, Sam's Club, and BJ's — which together account for over 50% of the Company's sales (Costco approximately 31.3%; Sam's Club approximately 19.8%; BJ's approximately 2.5% in 2025). BellRing also sells

through mass retailers (Walmart at approximately 24% of sales), e-commerce sites (Amazon at approximately 9.7%), and to a smaller degree through grocery, pharmacy, online specialty, and convenience channels. The club channel — and Costco in particular — is the dominant channel for Premier Protein.

44. BellRing does not report its financial results using a standard calendar year. Instead, BellRing's fiscal year begins on October 1 and ends on September 30. Accordingly, BellRing's first quarter runs from October to December, second quarter from January to March, third quarter from April to June, and fourth quarter from July to September.

**Defendants Had Access to, and Reviewed, Near Real-Time Data Concerning Sales, Consumer Demand, Competitor Interactions, Promotional Activity, and Market Share**

45. Throughout the Class Period, Defendants repeatedly told investors they reviewed and relied on highly accurate, near real-time data regarding BellRing's sales, consumer demand, competitor interactions, promotional activity, and market share. That data was derived primarily from two sources: Numerator and Circana.

46. Numerator provides omnichannel consumer purchase data across retail channels, including, club, mass, grocery, specialty, and eCommerce. Its datasets track, among other things, consumer purchasing patterns, market share, competitive dynamics, and promotional activity—the precise metrics at issue in this case. Numerator data is refreshed on a rolling basis with approximately a two-week lag. In practice, this means that throughout the Class Period, Defendants had near real-time visibility into the changes in consumer demand, competitive pressures, and the impact of promotions on BellRing's business. The scale and precision of this data underscores its significance. Numerator aggregates purchase data from over one million U.S. households, providing detailed, transaction-level visibility into consumer demand, brand switching, and category dynamics across retail environments.

47. Circana is a market research company that provides consumer behavior and retail execution measurement and insights. Circana was formed in August 2022 through the merger of IRI and NPD. Circana helps consumer packaged goods (CPG), retail, and healthcare companies understand market trends, consumer preferences, and competitive performance. Their services include point-of-sale (POS) data tracking, panel data analysis, marketing mix modeling, and assortment optimization. Circana further provides data about retail leakage, *i.e.*, when customers buy products from another seller, and customer churn, *i.e.*, when customers stop buying a brand, product, or category over a given period of time.

48. According to Fintech, which assists over 300,000 businesses with invoice data and payments, POS and delivery data, product and cost compliance, price book management, and industry market data insights using AI, seamless back-office and ERP system integration capabilities, and proprietary automation technology, Circana data typically arrives each Monday and is up to date through the Sunday of the prior week. In other words, there is only a one-week lag in reporting data.

49. According to a Numerator press release issued on April 10, 2023, BellRing selected Numerator as its primary consumer panel provider and "omnichannel purchase panel provider to bring new levels of consumer visibility and understanding." BellRing Brands Chief Growth Officer, Doug Cornille, was quoted in the release stating, "Numerator gives us a more holistic view of those consumers, which allows us to identify emerging behaviors and trends — and take decisive action." Numerator's Chief Revenue Officer, Lisa Gosselin, further stated in the press release, "[W]e're thrilled to help BellRing Brands meet their needs through a full range of capabilities to support retailer strategies, category expansion, new product innovation, and more."

50. BellRing's reliance on Numerator was continuous and reaffirmed during the Class Period. On October 9, 2025, Numerator issued another press release stating that BellRing Brands had extended its multi-year partnership, confirming that the Company relied on Numerator data to track market performance, evaluate competitive positioning, and inform retailer strategy. According to the press release, for the past three years, Numerator's unique datasets and collaborative partnership have delivered enhanced consumer visibility and actionable insights to BellRing Brands. As the health and wellness category rapidly evolves, and protein emerges as a key consumer focus, BellRing Brands has relied on Numerator data to validate strategies for new product launches, track in-market performance, guide brand positioning, and strengthen retailer partnerships.

51. Likewise, Numerator's Chief Revenue Officer, Brian Kay, stated in the press release, "We are proud to support BellRing Brands as they pursue consumer-centric growth and category leadership in a dynamic health and wellness environment."

52. Defendants themselves repeatedly acknowledged that they actively reviewed and relied on Numerator data to manage the business. For example, during an earnings call for the first quarter of fiscal 2023 ("1Q 2023"), held on February 7, 2023, Davenport explained that BellRing adopted Numerator to "have better coverage over our business, especially when it comes to eCommerce and specialty." Davenport added, "[a]nd then just the depth of insights that I think we're going to get from on the numerator side will be great. But we haven't even scratched that surface right now." Likewise, during BellRing's earnings call for the second quarter of fiscal 2023 ("2Q 2023"), held on May 9, 2023, Davenport stated that Numerator's data was "great" and "we're definitely able to kind of dig in to get a consumer understanding more." Davenport continued:

> We're understanding purchasing patterns, media habits. And it's helping us in, I would say, 2 specific areas. One is just improved day-to-day management. We're

> able to forecast more effectively because we understand the interactions with competitors as well as kind of where our growth trajectory is just from a -- like lifts, et cetera. But I think more importantly and more -- and I think what excites me is just around our future thinking and planning more around brand strategy, media and communications planning as we get into planning for '24 and beyond. That's where I think the deep consumer insights that we're gleaning from that data is really helping us.

53. BellRing was a paying subscriber to both Numerator and Circana throughout the Class Period and utilized those services to both analyze data concerning its products and to convey statistics and other information about sales and consumer demand to investors, including during analyst conference calls discussing the Company's earnings. In fact, between the fourth quarter of 2023 (the "4Q 2023") and the second quarter of 2026 (the "2Q 2026"), every BellRing investor presentation accompanying its earnings calls contained charts prepared with data from Circana and/or Numerator.

54. Through its subscriptions to Numerator and Circana, BellRing had on-demand access throughout the Class Period to data showing its shipment trajectory, consumption trajectory, trade-inventory dynamics, market-share position, and promotional volume on a current basis as the facts unfolded.

**At the Beginning of the Class Period, Retailers Began Temporarily Hoarding Inventory of Premier Protein**

55. Under BellRing's revenue-recognition policy, BellRing recognizes revenue when control of its products passes to the retailer. As a result, BellRing's reported "net sales" figure each quarter is a measure of shipments to retailers — not a measure of how much Premier Protein consumers actually purchased.

56. Because BellRing's revenue is determined by shipments rather than end-consumer purchases, two distinct figures move in any given quarter: ***shipments*** (what BellRing ships to retailers and books as revenue) and ***consumption*** (consumer demand). The amount of Premier

Protein product held in retailer warehouses and on retailer shelves but not yet sold to consumers is called "***trade inventory***."

57. Prior to the Class Period, supply constraints heavily impacted BellRing's financial results. Demand exceeded manufacturing capacity, often leaving the Company unable to fully meet retailer demand. This inability to meet retailer demand and supply adequate trade inventory significantly and negatively affected BellRing's historical growth and stock price.

58. As a result, BellRing's ability to meet retailer demand – and supply adequate trade inventory – was highly material to investors. BellRing thus closely tracked and publicly disclosed in earnings calls and financial statements prior to and during the Class Period when shipments outpaced consumption and vice versa.

59. In 2024, BellRing disclosed to investors that it had expanded manufacturing capacity by adding more third-party manufacturing partners. According to Defendants, the new manufacturing capacity allowed the Company to implement certain "demand drivers" for the first time in years.

60. BellRing's retailers responded by temporarily purchasing excessive levels of Premier Protein products. Beginning 2Q 2024 and continuing into 2Q 2025, retailers purchased quantities of Premier Protein products in amounts that far exceeded consumer demand. Retailers engaged in this "hoarding" to protect themselves against potential future manufacturing shortfalls, which had plagued BellRing during prior years. This "hoarding" temporarily, artificially, and materially boosted BellRing's sales of Premier Protein products during that period. Because Premier Protein products constitute nearly 86% of BellRing's revenue, this temporary, artificial, and material boost to Premier Protein sales also temporarily, artificially, and materially boosted BellRing's stock price.

61. Defendants knew why retailers were purchasing excess inventory because they regularly spoke with retailers about sales. During BellRing's earnings call for 2Q 2023 on May 9, 2023, Davenport told investors that "we're getting some really encouraging news from . . . the retailer calls that we're having" and "retailers are really leaning in and excited about the fact that we have capacity coming on." Likewise, during BellRing's earnings calls for 2Q 2024 on May 7, 2024 and FY 2024 on November 19, 2024, Davenport stated to investors that she regularly has "conversations with retailers" and "we're having incredibly constructive conversations with our retailers." The following year, during BellRing's earnings call for 3Q 2025 on August 5, 2025, Davenport told investors that "[m]any leading retailers turn to us for guidance" and "[r]etailers look to us for thought leadership and as a proven brand."

62. Defendants were also aware that, this artificial boost was going to be temporary because it is not economically rational for retailers to hold excess inventory for prolonged periods of time. Excess stock negatively impacts financial performance through increased holding costs, value depreciation, capital lock-ups, and lost revenue opportunities due to occupied warehouse capacity limiting the storage of other products.

63. Defendants likewise knew that the artificial boost from excess retailer inventory was always going to be temporary because this is what occurred in BellRing's past. The Defendants advised investors of such situations during BellRing's earnings calls for at least 2Q 2020, 3Q 2020, and 1Q 2023:

a. During BellRing's earnings call for 2Q 2020 on May 8, 2020, Rode told investors, "[W]e believe our customers will de-load from some of the inventory that they bought late in March because, obviously, the consumption pull-through hasn't been quite as strong in April, as Darcy [Davenport] alluded to." Davenport further stated, "[R]etailers . . . they took in big orders

toward the end of March and so many of our retailers had higher-than-normal inventories at the end of March, and that's why we said that there's going to be kind of a reversal between Q3 and Q2."

b. Likewise, on BellRing's earnings call for 3Q 2020 on August 7, 2020, Davenport told investors that "the high customer inventory at the end of Q2 . . . benefited Q2, but hurt Q3." Moreover, when an analyst expressed confusion and about why investors were not told this information earlier, Davenport responded, "Clearly, we need to do a better job because we look back at the scripts and we thought we were clear, but clearly not. So we can work on that for sure."

c. Similarly, during BellRing's earnings call for 1Q 2023, Davenport told investors that "international and domestic specialty channels" had "de-loaded inventory during the quarter" because of "historically inconsistent shipment patterns."

64. Accordingly, Defendants knew, or recklessly disregarded, that retailers' excess inventory accumulation was temporary and would reverse once retailers became comfortable with BellRing's supply stability after years of manufacturing constraints. Defendants further knew, or recklessly disregarded, that this normalization process would be accompanied by a period of retailer "destocking," during which retailers would significantly cut back on new Premier Protein orders while selling down existing inventory

65. By the second quarter of fiscal 2025 ("2Q 2025"), retailers ceased their "hoarding" of Premier Protein products. This led to a period of "destocking," during which BellRing's sales of Premier Protein products significantly declined because retailers cut back on new orders while selling down existing inventory.

66. The results were significant and profound. The reduction in retailer purchases by 2Q 2025 reduced BellRing's 3Q 2025 growth by mid-single-digits (~4-6%) and resulted in low single digits net sales growth for 3Q 2025.

67. As set forth below in ¶¶105-110, Defendants knew, or recklessly disregarded, that retailers were "hoarding" inventory during the Class Period and that this practice would eventually end. Defendants further knew, or recklessly disregarded, that BellRing's sales would suffer because retailers would cut back on new orders while selling down existing inventory. As Defendants later admitted during an earnings call on May 6, 2025, Defendants had known about this "hoarding" trend since "last summer," "thought this could happen," but "just had no idea when it would happen." Nonetheless, Defendants falsely told investors prior to that belated admission that retailers were simply purchasing to hit "target levels," fill "shelf gaps," and reach "adequate trade inventory" – thereby concealing the truth and artificially boosting the Company's stock price.

**Defendants Possessed and Reviewed Circana and Numerator Data Showing that Consumption of Premier Protein Was Weakening Since at Least 1Q 2025**

68. The revelation in 2Q 2025 that retailers had been hoarding inventory – and that they were now "destocking" – sparked immediate questions from analysts and investors about whether BellRing had also experienced declines in consumer demand—otherwise known as "consumption." While the Defendants assured investors that there was no weakness in consumption, these statements were materially false and misleading when made.

69. Defendants were in possession of Numerator data showing that consumer demand ("consumption") for Premier Nutrition began weakening by at least 1Q 2025 as reflected in

multiple independent measures, including brand shifting, category expansion/contraction, and category churn.[2]

70. On February 3, 2026, equity analysts at Morgan Stanley published an analysis showing that key indicators of consumer demand, including category churn, category expansion, and brand shifting, were deteriorating at Premier Protein since 1Q 2025. As the analysts concluded, "trends have been volatile and visibility remains low, thus we continue to believe it is prudent to model FY26 revenue/EBITDA toward the lower end of management's guidance range."

71. The analysts used data from Numerator which, as alleged in ¶¶45-54, Defendants also had access to at the time of their statements to investors during the Class Period. The charts from the Morgan Stanley analyst report setting forth the deteriorating trends in consumer demand, including category churn, category expansion, and brand shifting, are set forth below.[3]

72. **Brand Shifting:** Brand shifting reflects consumers switching between competing products. By 1Q 2025, volume in Premier's core club channel was already down 1.9% year-over-year as customers shifted to competing brands. This decline accelerated to 2.8% in 2Q 2025, 4.9% in 3Q 2025, and 8.1% by the end of the year. Similar downward trends were observed across other distribution channels.

[2] The below charts are year-over-year comparisons of how many units of Premier Protein products customers purchased. Each bar represents a 13-week period that coincides approximately to each calendar quarter.

[3] The boxes in red have been added by Plaintiff.







73. **Category Expansion/Contraction:** Category expansion measures changes in purchasing intensity among existing customers. As reflected in the chart below, in 1Q 2025, existing customers increased purchases by approximately 11.9% year-over-year. That growth slowed to 7.3% in 2Q 2025, declined further to 1.6% in 3Q 2025, and turned negative (-2.1%) by the end of the year.




74. The same downward trends are visible for data from Premier's all-important club channels as reflected in the following chart:




75. **Category Churn:** Category churn measures the rate at which new customers enter and existing customers exit the category. In 1Q 2025, new customers increased purchases by approximately 22.4% year-over-year. As reflected in the following chart, that growth declined to 16.6% in 2Q 2025, 15.9% in 3Q 2025, and 4.1% by the end of the year.




76. Similar downward trends occurred in Premier's all-important Club Channel, as reflected in the below chart:




77. The metrics reflected above did not merely show isolated noise or normal quarter-to-quarter variation. And the deceleration in Premier Protein consumption growth was not a single, undifferentiated softening. Rather, Numerator data — to which Defendants had continuous access — showed weakening across each of the three principal components that drive consumption: category expansion/contraction (existing-customer purchase volume), category churn (new-customer entry into the category), and brand shifting (movement of consumers between competing brands within the category). This data revealed to Defendants that Premier suffered from

consistent deterioration across multiple measures of consumer behavior: customers were shifting to competitors, existing customers were buying less incrementally, and new customer growth was slowing. Indeed, as Davenport revealed during BellRing's earnings call for 2Q 2026 on May 5, 2026, "I think our latest estimates were internally somewhere ***around 40 new competitors over the last 18 months. So it's tremendous. And as the number one player, we are going to get affected by that***."

78. Moreover, as alleged in ¶47, Numerator is not the only source of such data about category expansion/contraction (existing-customer purchase volume), category churn (new-customer entry into the category), and brand shifting (movement of consumers between competing brands within the category). Circana supplies the same data on these key metrics as well. Defendants thus possessed data through two separate sources – Numerator and Circana – that three principal components that drive consumption were declining during the Class Period.

79. As alleged below, in ¶¶128-139, this deterioration directly contradicted Defendants' assurances during the Class Period that there was "really no change in consumption," "no softness," and "no concern around consumption."

**Defendants Knew that Elevated and Unsustainable Promotional Activity Beginning in 2Q 2025 Masked Weakening Consumption**

80. As underlying consumer demand for Premier Protein products weakened during the Class Period, Defendants massively increased the frequency and scope of promotional activity, i.e., discounts to the regular shelf price, to maintain sales volume. While promotional activity is common in consumer products, Defendants deployed promotions at a frequency (how often) and scope (affecting how many sales) far exceeding industry norms, and relied on the short-term volume generated by those promotions to create the appearance of sustained demand. Defendants nonetheless presented BellRing's reported sales as evidence of strong underlying consumer

demand while the Company's own data showed that elevated promotional activity was artificially propping up those sales.

81. Defendants knew that the convenient nutrition category was not ordinarily promotion heavy and understood the distinction between typical and excessive promotional activity in Premier's core category. During BellRing's November 18, 2025 earnings call for 4Q 2025, Davenport told investors to "remember that this category is actually fairly low promotion compared to many categories" and that "[i]t's just about 25% to 30% sold on deal." In other words, companies in the convenient nutrition category historically only sold approximately 25-30% of their products on promotion. Davenport reiterated the same point during BellRing's February 3, 2026 earnings call for 1Q 2026, explaining that "the category actually – it's usually not that promotionally driven" and that it is "about 25 to 30% sold on deal." Davenport also characterized promotional activity materially above that level as "less rational." Davenport further emphasized the same point during BellRing's May 5, 2026 earnings call for 2Q 2026, explaining that "27% of RTD shake category volumes were sold on price promotion" during the quarter, that even 27% was a "big number," and that engaging in this scale of promotional activity was "not acting very rationally."

82. Davenport's own statements regarding typical promotional levels are consistent with industry benchmarks confirming that elevated promotional intensity can distort reported sales. For example, in a 2019 study published by the National Bureau of Economic Research, analyzing approximately 50,000 CPG products found that, on average, approximately 28.7% of volume was sold on promotion, closely aligned with the 25%-30% range that Defendants themselves identified as typical.

83. Defendants also acknowledged prior to the Class Period that promotional activity beyond this 25-30% range would subsidize sales volume and was not a sustainable demand driver for Premier Protein. During BellRing's November 21, 2023 4Q 2023 earnings call, Davenport acknowledged that BellRing in 2021 had previously been "a bit heavy on promotion," and stated that "we've learned" that the Company was "probably subsidizing a fair amount of volume." Davenport further stated that "we are getting back to the level that we think is appropriate for our business, without . . . subsidizing a lot of volume," and that the promotional activity in FY 2024 "is representative."

84. Consistent with that understanding, during BellRing's November 19, 2024 earnings call, Davenport emphasized that Premier Protein's growth was demand-driven rather than promotion-driven. Davenport stated that fiscal 2024 was "a pivotal year for our largest brand, Premier Protein," because BellRing had "steadily increased our supply" and "demonstrated that the demand is there and will continue to grow as we layer in demand drivers." Davenport then highlighted what made that growth "truly unique": BellRing had achieved it "without significant advertising or promotion at many retailers," which, she said, "further illustrat[ed] the brand strength" and "future potential." Thus, Defendants affirmatively framed Premier Protein's growth as demand-driven, not promotion-driven, less than two months before materially increasing promotions.

85. Unbeknownst to investors and contrary to Defendants' statements, BellRing began selling a massively elevated percentage of Premier Protein products on promotion during the Class Period. By 2Q 2025 and continuing through 4Q 2025, promotional frequency and scope reached levels significantly above both BellRing's "appropriate" levels in 2024 and the 25%-30% industry benchmark acknowledged by Defendants. Data available to Defendants, including Circana data

that they represented that they monitored and relied upon, reflected that the percentage of Premier Protein sales occurring on promotion increased sharply during this period, rising from approximately 19% in December 2024 to approximately 48% in January 2025, reaching approximately 54% by March 2025, and peaking at approximately 57% in August 2025. Even during periods where promotional activity did not reach these peak levels, it remained materially elevated relative to both BellRing's historical levels and industry norms as acknowledged by Defendants. These were not incremental promotions. They represented a sustained and material shift in how BellRing generated its reported sales. The below chart, published in an analyst report by Evercore ISI Research on August 26, 2025, which drew on Circana data, corroborates these elevated levels of promotional activity as of August 2025.[4]

**Figure 3: Percent volume on promotions – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Dec (4 weeks) | 19% | 20% |
| Jan (5 weeks) | 48% | 45% |
| Feb (4 weeks) | 29% | 15% |
| Mar (4 weeks) | 54% | 39% |
| Apr (3 weeks) | 35% | 23% |
| July (4 weeks) | 33% | 32% |
| August (2 weeks) | 57% | 17% |

*Source: Circana, Evercore ISI Research*

86. In contrast to Davenport's assurance that BellRing did not – and would not - continue heavy promotions to drive demand, BellRing's promotional activity during FY 2025 vastly exceeded the levels Defendants had previously described as "appropriate," far exceeded the levels Defendants told investors were typical for the category, and far exceeded the levels typical of approximately 5,000 CPG products, as set forth in ¶¶81-83.

[4] The charts do not provide promotional data for September through November 2024 or 2025.

87. At these elevated levels, promotional activity does not merely support sales, it becomes a primary driver of reported consumption. The economic effects of such promotions are well understood by Defendants, who have decades of experience in consumer goods. Price discounts generate short-term increases in unit volume by accelerating purchases and shifting demand across periods, rather than creating durable increases in underlying consumption. Empirical research studies published by the Marketing Science Institute, a nonprofit research organization, show that price promotions create short-term increases in sales, but those effects are temporary and dissipate over time, with little to no lasting impact on underlying demand.[5] In practice, promotions pull forward purchases and reallocate buying behavior, such that increased sales during promotional periods are typically followed by reduced purchasing in subsequent periods once inventory is consumed.

88. Consistent with this dynamic, BellRing's elevated and unsustainable promotional activity supported Premier Protein's reported consumption even as underlying demand weakened across key metrics, including category churn, category expansion, and brand shifting. When Defendants eventually reduced promotional activity in 1Q 2026, Premier Protein's market share immediately declined from approximately 25% to 22% – its lowest level since approximately June 2024. This decline following the reduction in promotional intensity demonstrates that BellRing's prior reported growth was materially sustained by elevated promotional activity rather than durable underlying consumption. The below tables from BellRing's 1Q 2025 Investor Presentation depict

---

[5] Nijs, V. R., Dekimpe, M. G., Steenkamp, J. E. B. M., & Hanssens, D. M. (2001). *The category-demand effects of price promotions*. Marketing Science, 20(1), 1–22.; Nijs, V. R., Dekimpe, M. G., Steenkamp, J. E. B. M., & Hanssens, D. M. (2000). *The short- and long-run category demand effects of price promotions*. Cambridge, MA: Marketing Science Institute (Report No. 00-109).

the rapid decline in Premier Protein sales once BellRing's massive and unsustainable promotions ceased:

**Circana Data from BellRing's 1Q 2026 Investor Presentation**
**Show Rapid Decline Once Unsustainable Promotions End**






89. Defendants possessed materially greater visibility into BellRing's true demand conditions than outside analysts or investors because Defendants had access not only to third-party datasets such as Numerator and Circana, but also to BellRing's internal shipment data, retailer inventory information, customer-level ordering trends, demand-planning analyses, promotional forecasts, and other internal business information. Thus, while certain analysts could observe portions of market activity through external datasets, Defendants had a substantially more complete and contemporaneous understanding of the extent to which BellRing's reported growth was being driven by elevated retailer inventory accumulation, weakening underlying consumption, increasing competitive pressure, and extraordinary promotional activity. Moreover, any isolated analyst observations based on external datasets did not reveal the full extent, significance, or sustainability implications of these trends, particularly when Defendants continued to publicly attribute BellRing's growth to strong demand, organic growth, resilient consumption, distribution gains, and normalizing inventory conditions. Accordingly, Defendants misled investors concerning the true drivers, quality, and sustainability of BellRing's reported sales growth and financial performance.

90. As set forth below, despite contemporaneous Circana data regarding promotions, including data reflected in an Evercore ISI Research report published on August 26, 2025, Defendants repeatedly denied that there was anything unusual about BellRing's promotional activity throughout the Class Period. During BellRing's August 5, 2025 3Q 2025 earnings call, Rode described BellRing's promotions as merely "incremental promotional activity" and represented that BellRing was "return[ing] to historical promotional levels." Likewise, during BellRing's November 18, 2025 4Q 2025 and FY 2025 earnings call, Davenport and Rode again characterized Premier Protein's growth as driven by "incremental promotion events," despite

knowing, or recklessly disregarding, that BellRing's promotional activity had reached extraordinary and unsustainable levels far exceeding both BellRing's historical promotional activity and the 25% to 30% category norm Defendants themselves identified. These statements materially understated to investors the extent to which BellRing's reported sales growth and consumption trends were being supported by abnormally elevated promotions rather than durable underlying consumer demand.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### August 6, 2024 to May 5, 2025 (3Q 2024 - 2Q 2025): Defendants Issue Materially False and Misleading Statements About the Reasons for Growth in Retailer Inventory and Premier Protein's Sales

*Summary of Materially False and Misleading Statements*

91. As alleged in more detail below, in the years prior to the start of the Class Period, BellRing's financial results were largely shaped by supply constraints. Demand often exceeded manufacturing capacity, meaning the Company often struggled to produce enough products to fully meet retail orders. However, in early 2024, BellRing expanded capacity by adding and ramping up additional third party manufacturing partners, including partners that built brand new facilities largely dedicated to producing the Company's products.

92. In the days leading up to the Class Period, BellRing's stock precipitously declined. Between July 8, 2024 and August 5, 2024, BellRing's stock price fell from an opening price of $60.80 on July 8, 2024 to a closing price of $49.32 on August 5, 2024, an approximately 19% decline. This precipitous fall set the stage for the Defendants' stock inflation scheme, which began the next day.

93. Beginning on August 6, 2024, the first day of the Class Period, Defendants began repeatedly assuring investors that retailer inventory levels were improving to "target levels,"

"filling the gap of trade inventory," and reaching "adequate trade inventory." On May 6, 2025, however, Defendants shocked investors when they admitted that contrary to earlier statements, retailers had instead been "hoarding inventory to make sure that they didn't run out of stock on shelf," and now "felt comfortable about bringing them down." Defendants revealed this "destocking" was "expected to be a mid-single-digit headwind to our third quarter growth," and that Defendants "now expect[ed] Q3 net sales growth of low single digits[.]" Defendants further revealed that they had known about this "hoarding" trend since "last summer," "thought this could happen," but "just had no idea when it would happen."

94. Defendants' revelations about retailer "hoarding" further showed that BellRing's quarterly and annual filings between 3Q 2024 and 1Q 2025 had materially misrepresented the source of the Company's sales growth during these quarters. In particular, in financial statements and during earnings calls, Defendants repeatedly attributed Premier Protein's sales growth and profit to particular sources while omitting that retailers' temporary and unsustainable hoarding was materially contributing to these metrics.

95. The below chart shows the decline in BellRing's stock price immediately preceding the Class Period, the price inflation that resulted from Defendants' materially false and misleading statements about retailer hoarding, and the precipitous decline in BellRing's stock price when Defendants revealed the truth on May 6, 2025.




*Relevant Pre-Class Period Statements*

96. Prior to the start of the Class Period, BellRing told investors that it had remedied its manufacturing problems and was working with retailers to restock to normal levels. For instance, during BellRing's May 9, 2023 earnings call regarding its 2Q 2023 financial results, Rode stated, "[F]rom a shipments per consumption, we do expect shipments to slightly outpace consumption, but not dramatically." Thereafter, during BellRing's May 7, 2024 earnings call to discuss its 2Q 2024 financial results, Rode stated, "Our expectation is that shipments and consumption will largely track. It would likely modestly swing towards shipments. It's a little bit of an inventory load, but nothing -- we're not expecting anything dramatic in the second half. So again, we're trying to replenish shelves, as well as keep up with the demand, so we would expect a little bit of shipments above consumption in the second half."

*Defendants' Materially False and Misleading Class Period Statements About the Reasons that Retailers Were Increasing Inventory*

97. In the days leading up to the Class Period, BellRing's stock precipitously declined. Between July 8, 2024 and August 5, 2024, BellRing's stock price fell from an opening price of $60.80 on July 8, 2024 to a closing price of $49.32 on August 5, 2024, an approximately 19% decline. This precipitous fall set the stage for the Defendants' stock inflation scheme, which began the next day.

98. After the close of trading on August 5, 2024, BellRing announced its 3Q 2024 financial results for the period ended June 30, 2024 in a press release.

99. The Class Period began the next day. During the last few weeks of summer in 2024, on August 6, 2024, BellRing held an earnings call to discuss its financial results for 3Q 2024 and repeatedly emphasized that retailer/trade inventory levels were reaching normal levels. During the call, Rode stated, "Entering the fourth quarter, trade inventory levels are improved in nearly to ***target levels*** with the ***remaining gaps*** to be filled in Q4." Rode continued, "We expect shipment dollar growth for Premier RTD shakes to ***modestly*** outpace consumption growth as we fill the remaining ***retailer inventory gaps*** and low new distribution." Davenport added, "So when we get back to -- which we are close, when we get back to adequate safety stock as well as ***adequate trade inventory***, we just will not see these types of kind of, I guess, volatility as you put it." Davenport further emphasized, "We will see some increase in Q4 not as dramatic as we did last year, but we got some nice space in that retailer. And then we'll also see a little more favorability from just ***filling the gap of trade inventory*** that we didn't fill in Q3. So part of the increases will be out of ***filling the trade inventory for the ones that are left*** and then partially it's going to be shipping in for new distribution. So yes, we do expect and Paul [Rode] said this in his prepared remarks, we do expect to have shipments a little bit ahead of consumption in Q4."

100. Rode likewise stated, "Yeah. So as I mentioned in my prepared remarks that we do expect shipments to modestly outpace consumption growth or shipment growth slightly outpaced consumption growth in the fourth quarter, and that's because ***we're continuing to replenish the remaining out of stocks and getting our retailers' inventories pool***, but also shipping new distributions. Darcy [Davenport] touched on some of this before. So we've had some bottles going in and some other distribution. So yes, expect a modest increase or shipments ahead of consumption in the fourth quarter."

101. Defendants continued to emphasize that retailer/trade inventory levels were reaching normal levels when they discussed the Company's financial results for 4Q 2024. After the close of trading on November 18, 2024, BellRing announced its 4Q 2024 fiscal year financial results in a press release.

102. The next day, November 19, 2024, BellRing held an earnings conference call to discuss its financial results for 4Q 2024. During the earnings call, Rode stated, "***Shipment dollar growth outpaced consumption dollar growth with shipments benefiting from*** load ends of new distribution and Q1 promotions as well as ***replenishment of food channel shelf gaps***." Rode added, "As expected, ***shake inventory levels increased*** in the fourth quarter driven by incremental production volumes, ***putting us in a strong inventory position at the end of the year***."

103. The statements referenced above in ¶¶99-102 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that retailers were not merely replenishing ordinary inventory "gaps," returning to "target levels," or building "adequate trade inventory," as represented to investors. Rather, as Defendants later admitted, BellRing's major retail customers had materially increased their "weeks of supply" beginning in the second half of 2024 and were "hoarding inventory" in amounts materially above normal operating levels because

they feared future supply disruptions after years of BellRing's manufacturing constraints. Defendants further knew, or recklessly disregarded, that this inventory accumulation was temporary and unsustainable and was materially inflating BellRing's reported shipment growth and revenues during the Class Period. Nonetheless, Defendants repeatedly characterized the inventory build as ordinary replenishment activity associated with normalized retail inventory levels, new distribution gains, and "filling the gap of trade inventory," thereby misleading investors concerning the true source and sustainability of BellRing's reported growth.

104. The statements referenced above in ¶¶99-102 were further materially false and misleading because Defendants knew, or recklessly disregarded, that BellRing's reported shipment growth materially exceeded underlying consumer demand due to this temporary retailer inventory build. In truth, retailers were purchasing quantities of Premier Protein products materially in excess of then current consumption in order to protect themselves against future out of stock conditions. Defendants further knew, or recklessly disregarded, that once retailers became confident BellRing had resolved its supply issues and achieved sustained in stock performance, those retailers would reduce their inventory positions and materially cut back on future orders while working through existing stock. Thus, Defendants knew, or recklessly disregarded, that BellRing's elevated shipment growth during the Class Period was not indicative of sustainable future demand and that there would be a future sales deceleration once retailers began destocking.

105. On May 6, 2025, BellRing shocked investors with the truth when it reported its 2Q 2025 financial results and held an earnings conference call the same day to discuss the results. During the earnings call, Rode admitted that Defendants had known since at least summer 2024 that retailers had been stockpiling weeks of inventory ever since BellRing had exited its manufacturing constraints. Specifically, Rode disclosed: "[W]hat we've seen is back when -- in

last summer, last kind of the second half of last year, some of our retailers leaned into inventory weeks of supply as we were exiting our supply constraints." Rode further admitted that retailers had since begun reducing those elevated inventory levels, explaining that "over the last several months that they have chosen now to optimize. And so we're seeing that in our orders in particular in April." Rode further revealed that, as a result of this retailer destocking, "several key retailers lowered their weeks of supply on hand, which is expected to be a mid-single-digit headwind to our third quarter growth." Rode also admitted: "We now expect Q3 net sales growth of low single digits[.]"

106. Davenport likewise admitted that BellRing's retailers had not merely been rebuilding ordinary inventory levels, but instead had been stockpiling Premier Protein products in response to BellRing's prior supply shortages. Davenport explained:

> So this is really tied to retail -- so specifically one, but a couple of retailers holding on kind of protecting themselves coming out of capacity constraints. They were ***a little bit hoarding*** inventory to make sure that they didn't run out of stock on shelf. And then we've now showed over several quarters of high in-stock rates and so they felt comfortable about bringing them down. ***We thought this could happen***. ***We just had no idea when it would happen***. And so -- and we're seeing it.

107. Indeed, beyond Defendants' own admission in May 2025 – that they knew that retailers were "hoarding" inventory since "last summer" and that they "just had no idea when" the hoarding would end – Defendants also knew about retailer hoarding because they regularly spoke with retailers about why and when retailers were purchasing Premier Protein products. For instance, during BellRing's earnings call for 2Q 2023 on May 9, 2023, Davenport told investors that "we're getting some really encouraging news from . . . the retailer calls that we're having" and "retailers are really leaning in and excited about the fact that we have capacity coming on." Likewise, during BellRing's earnings calls for 2Q 2024 on May 7, 2024 and FY 2024 on November 19, 2024, Defendant Davenport stated to investors that she regularly has "conversations

with retailers" and "we're having incredibly constructive conversations with our retailers." The following year, during BellRing's earnings call for 3Q 2025 on August 5, 2025, Davenport told investors that "[m]any leading retailers turn to us for guidance" and "[r]etailers look to us for thought leadership and as a proven brand." These repeated communications with retailers – including discussions concerning BellRing's increased manufacturing capacity and retailer purchasing behavior – further support the inference that Defendants knew why retailers were accumulating excess inventory and understood that such purchasing patterns were temporary and demand distortive.

108. Moreover, the Individual Defendants – who have decades of experience in consumer products – knew that retailers' hoarding would inevitably reverse because it is not economically rational for retailers to hold excess inventory for prolonged periods of time. Excess inventory increases warehousing and carrying costs, ties up working capital, reduces operational flexibility and limits retailers' ability to allocate shelf and warehouse space to other products.[6] Defendants therefore knew, or recklessly disregarded, that once retailers gained confidence in BellRing's supply stability, those retailers would reduce their inventory positions and materially cut back on future Premier Protein orders while selling through existing stock.

109. The Individual Defendants likewise knew that retailers' hoarding would inevitably reverse because this is what occurred in BellRing's past. The Defendants advised investors of such situations during BellRing's earnings calls for at least 2Q 2020, 3Q 2020, and 1Q 2023. Indeed, after being criticized by an analyst during one such call, Davenport told investors that the

---

[6] Syed Saleheen, Yogita Parihar. (2025). The Effect of Inventory Management on Working Capital Efficiency in Retail Chains. International Journal of Scientific Research and Engineering Development (Vol. 8, Number 3, pp. 1628–1637).

Defendants would "do a better job" of alerting investors of when retailers had excess inventory in the future:

a. During BellRing's earnings call for 2Q 2020 on May 8, 2020, Rode told investors, "[W]e believe our customers will de-load from some of the inventory that they bought late in March because, obviously, the consumption pull-through hasn't been quite as strong in April, as Darcy [Davenport] alluded to." Davenport further stated, "[R]etailers . . . took in big orders toward the end of March and so many of our retailers had higher-than-normal inventories at the end of March, and that's why we said that there's going to be kind of a reversal between Q3 and Q2."

b. Likewise on BellRing's earnings call for 3Q 2020 on August 7, 2020, Davenport told investors that "the high customer inventory at the end of Q2 . . . benefited Q2, but hurt Q3." Moreover, when an analyst expressed confusion about why investors were not told this information earlier, Davenport responded, "Clearly, ***we need to do a better job*** because we look back at the scripts and we thought we were clear, but clearly not. So ***we can work on that*** for sure."

c. Similarly, during BellRing's earnings call for 1Q 2023, Davenport told investors that "international and domestic specialty channels" had "de-loaded inventory during the quarter" because of "historically inconsistent shipment patterns."

110. Simply put, Defendants knew, or recklessly disregarded, that retailers were "hoarding" inventory beginning in at least the summer of 2024, that this inventory build was temporarily and materially inflating BellRing's reported sales and shipment growth, and that the practice would inevitably reverse through a period of retailer destocking that would materially impact future revenues and growth. Nonetheless, Defendants falsely and misleadingly assured investors throughout the Class Period that retailers were merely purchasing to achieve ordinary

"target levels," replenish "shelf gaps," and reach "adequate trade inventory," thereby concealing the true source and unsustainable nature of BellRing's reported growth.

111. As a result of Defendants' disclosures on May 6, 2025, the price of BellRing stock declined $14.88 per share, or 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume.

*Defendants' Materially False and Misleading Class Period Statements About the Reasons for Premier Protein's Growth in Sales*

112. The Defendants' revelations about retailer "hoarding" further showed that BellRing's quarterly and annual SEC filings and other Company statements between 3Q 2024 and 1Q 2025 had materially misrepresented the source of the Company's sales growth. In particular, in financial statements filed with the SEC and during earnings calls, Defendants repeatedly attributed Premier Protein's sales growth and profit to particular sources – such as "organic growth" and "distribution gains" – while omitting that retailers' temporary and unsustainable hoarding also materially contributed to these metrics.

113. After the close of trading on August 5, 2024, BellRing announced its 3Q 2024 financial results for the period ended June 30, 2024 in a press release filed with the SEC on Form 8-K. In the press release, BellRing reported that "Premier Protein RTD shake net sales increased 18.5%, driven by 19.4% increase in volume and 0.9% decrease in price/mix. ***Volume gains were driven by organic growth and distribution gains***." The next day, on August 6, 2024, BellRing filed its financial results for 3Q 2024 with the SEC on Form 10-Q, stating that "[s]ales of Premier Protein products were up $72.3 million, or 20%, ***driven by 19% higher volumes primarily due to higher RTD shake production and distribution gains***."

114. Likewise, during the Company's earnings call discussing its financial results for 3Q 2024 on August 6, 2024, Davenport stated, "[g]rowth was robust in mass, food and

eCommerce, ***driven by strong velocities and distribution expansion*** in mass and food." During that earnings call, Defendant Rode likewise stated, "RTD shake growth of 19% was ***driven by organic growth, distribution gains, and to a lesser extent, higher trade inventory levels***."

115. The statements referenced above in ¶¶113-114 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's reported sales growth and shipment volumes were not being driven solely, or even principally, by "organic growth," "distribution gains," "strong velocities," increased "RTD shake production," or ordinary inventory normalization, as represented to investors. Rather, as Defendants later admitted, BellRing's major retail customers had materially increased their inventory positions and "weeks of supply" beginning in the summer of 2024 because they feared future supply disruptions after years of BellRing manufacturing constraints. Defendants further knew, or recklessly disregarded, that this retailer inventory build materially inflated BellRing's reported shipment growth and revenues during 3Q 2024 because retailers were purchasing quantities of Premier Protein products materially in excess of then-current consumer demand. Nonetheless, Defendants misleadingly attributed BellRing's reported growth to purportedly sustainable demand drivers, including "organic growth," "distribution gains," "strong velocities," and increased production capacity, while minimizing retailer inventory accumulation as merely "to a lesser extent, higher trade inventory levels." In truth, retailer "hoarding" was a material driver of BellRing's reported sales growth that Defendants knew would decline once retailers reduced inventory levels and destocked existing product, as the Defendants admitted during BellRing's earnings call on May 6, 2025.

116. Defendants continued to make materially false and misleading statements about the source of Premier Protein's growth in their SEC filings and earnings call for 4Q 2024 and FY 2024. After the close of trading on November 18, 2024, BellRing reported its 4Q and FY 2024

financial results in a press release issued after market close and furnished to the SEC on Form 8-K. In the press release, BellRing reported that "Premier Protein RTD shake net sales increased 20.7%, driven by 19.6% increase in volume and 1.1% increase in price/mix. ***Volume gains were driven by organic growth and distribution gains***." The next day, on November 19, 2024, BellRing filed its Form 10-K for 4Q and FY 2024 for the period ended September 30, 2024, stating that "[s]ales of Premier Protein products were up $317.8 million, or 23%, ***driven by 25% higher volumes primarily due to increased promotional activity (which resulted in lower average net selling prices), higher RTD shake production and distribution gains***."

117. Likewise, during the Company's earnings call discussing its financial results for 4Q 2024 and FY 2024 on November 19, 2024, Davenport stated, "Growth was strong in mass, food, and e-commerce channels ***driven by accelerated velocities, feature and display activity, along with distribution expansion*** in mass and food." Rode further stated, "RTD shake sales grew 21% ***boosted by organic growth and distribution gains as well as a 1% benefit from our price increase taken late in Q4***."

118. The statements referenced above in ¶¶116-117 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's reported growth during 4Q 2024 and FY 2024 was materially driven by temporary and unsustainable retailer inventory accumulation, not merely "organic growth," "distribution gains," "accelerated velocities," "feature and display activity," "promotional activity," or a "price increase," as represented to investors. By this time, Defendants knew, or recklessly disregarded, that retailers had materially increased their "weeks of supply" and were continuing to purchase Premier Protein products in excess of underlying consumer demand in order to protect themselves against potential future out-of-stock conditions. Defendants further knew, or recklessly disregarded, that these

elevated retailer purchases were artificially inflating BellRing's reported sales and shipment growth and were not indicative of sustainable future demand trends. Nonetheless, Defendants repeatedly portrayed BellRing's growth as the result of durable consumer demand and successful commercial execution, including "organic growth," "distribution gains," "accelerated velocities," and merchandising activity, while failing to disclose that a material portion of the Company's reported growth was instead attributable to temporary retailer "hoarding" that Defendants knew would inevitably reverse through a period of retailer destocking and reduced orders.

119. Defendants continued to make materially false and misleading statements concerning the drivers of Premier Protein's growth in connection with the Company's 1Q 2025 results. After the close of trading on February 3, 2025, BellRing announced its financial results for 1Q 2025 for the period ended December 31, 2024 in a press release filed with the SEC on Form 8-K. In the press release, BellRing reported that "Premier Protein RTD shake net sales increased 25.3%, driven by 21.3% increase in volume and 4.0% increase in price/mix. ***Volume growth was driven by distribution gains and incremental promotional activity***." The next day, on February 4, 2025, BellRing filed its Form 10-Q for 1Q 2025, repeating that "[s]ales of Premier Protein products were up $96.0 million, or 26%, driven by 21% higher volumes. ***Volumes increased primarily due to distribution gains and incremental promotional activity***."

120. Likewise, during the Company's earnings call for 1Q 2025 on February 4, 2025, Davenport stated, "Growth was strong in all channels ***driven by distribution expansion, accelerating velocities, and incremental promotional activity[,] expansion in form, including bottles and pack size, along with improved in-stocks drove the distribution gains***." Rode further stated, "***Distribution gains, incremental promotions, and organic growth drove the sales increase as well as a benefit from our price increase on shakes taken in Q4***."

121. The statements referenced above in ¶¶119-120 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's reported sales growth during 1Q 2025 was not being driven solely by "distribution gains," "incremental promotional activity," "accelerating velocities," "expansion in form," "improved in-stocks," "organic growth," or pricing benefits, as represented to investors. Rather, Defendants knew, or recklessly disregarded, that BellRing's reported growth continued to be materially supported by retailers purchasing quantities of Premier Protein products materially in excess of underlying consumer demand as retailers maintained elevated inventory levels and "weeks of supply." Defendants further knew, or recklessly disregarded, that these inflated retailer purchases were temporary and unsustainable and would reverse once retailers became comfortable with BellRing's supply stability and began reducing inventory positions. Nonetheless, Defendants continued to portray BellRing's growth as the product of strong underlying demand trends and successful execution while concealing that retailer "hoarding" remained a material contributor to reported sales growth.

122. As set forth in ¶¶105-110, Defendants ultimately disclosed the truth about the source and sustainability of BellRing's reported sales growth during the May 6, 2025 earnings call for 2Q 2025. During the call, Defendants admitted for the first time that BellRing's major retail customers had materially increased their inventory positions beginning in summer 2024 because they were "protecting themselves" as BellRing emerged from years of supply constraints. Specifically, Rode admitted that Defendants knew that retailers had "leaned into inventory weeks of supply" since "last summer" and "the second half of last year," while Davenport acknowledged that retailers had been "a little bit hoarding inventory to make sure that they didn't run out of stock on shelf." Defendants further admitted that these elevated retailer purchases were temporary and

unsustainable and that retailers had now begun reducing inventory levels and "optimizing" their "weeks of supply on hand," resulting in materially reduced orders that were "expected to be a mid-single-digit headwind" to BellRing's future growth. As Davenport admitted, Defendants understood during the Class Period that retailers had accumulated elevated inventory positions that would eventually reverse once retailers became comfortable with BellRing's supply stability, stating: "[w]e thought this could happen. We just had no idea when it would happen."

123. These admissions directly contradicted Defendants' prior representations throughout 3Q 2024, 4Q 2024, and 1Q 2025 that BellRing's growth was primarily attributable to sustainable demand drivers such as "organic growth," "distribution gains," "accelerating velocities," increased production capacity, promotional execution, and improved in-stock conditions. In truth, Defendants admitted that a material portion of BellRing's reported sales growth had instead been driven by temporary retailer inventory accumulation that Defendants knew would inevitably reverse once retailers became comfortable with BellRing's supply stability. The disclosures further revealed that BellRing's previously reported shipment and sales growth were not indicative of sustainable future demand and had materially overstated the strength and durability of the Company's underlying business trends.

124. On this news, the price of BellRing stock declined $14.88 per share, or 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume. BellRing common stock, however, remained artificially inflated.

125. As set forth below in ¶¶128-139, however, BellRing common stock nevertheless continued to trade at artificially inflated levels because the same day that Defendants admitted the truth about retailer "hoarding" – May 6, 2025 – Defendants began falsely assuring investors that there was "no softness" and "no concern around consumption," while continuing to conceal the

extent to which BellRing's reported results had also been supported by weakening but promotionally-driven consumer demand.

**May 6, 2025 to May 4, 2026 (2Q 2025 – 2Q 2026): Defendants Issue Materially False and Misleading Class Period Statements About Consumer Consumption and Promotional Activity**

*Summary of Materially False and Misleading Statements*

126. As alleged below, Defendants' admissions during the May 6, 2025 earnings call concerning retailer "hoarding" and destocking immediately prompted analysts to question whether BellRing was also experiencing weakness in consumer demand—otherwise known as "consumption." Defendants denied any such weakness. That denial was materially false and misleading because, at the time it was made, Defendants possessed contemporaneous data showing that underlying consumer demand was already weakening while BellRing's reported consumption was being artificially propped up through massive and unsustainable promotions. Defendants nonetheless hid the scope of these promotions from investors.

127. In the quarters that followed, Defendants gradually disclosed what they had concealed: that demand was weakening, that growth was promotion-driven and unsustainable, and that competition was eroding BellRing's core channels, causing significant declines in the Company's stock price.

*2Q 2025 Earnings Call and Financial Statements*

128. Analysts on Defendants' May 6, 2025 earnings call for 2Q 2025 immediately questioned whether BellRing's disclosed retailer "hoarding" and resulting "destocking" reflected underlying weakness in consumer demand ("consumption"). During the call, JPMorgan Chase & Co. analyst Kenneth Goldman noted that destocking of that magnitude "typically . . . doesn't happen unless there is . . . either deceleration in consumption or disappointment in consumption from that retailer side," and asked, whether BellRing was hearing similar feedback from retailers.

129. In response, Davenport unequivocally denied any weakness in consumer demand, stating in pertinent part, as follows:

> Yes, for sure. So I really think that this dynamic is unique and related to coming out of capacity constraints. And so ***there's really no change in consumption***. I mean we continue to see strong consumption. Q2 was up 25%, boosted by the New Year, New You, promotions and advertising.
>
> As we go into Q3, ***we're expecting to continue to see strong consumption***, saw 16% in April. We expect to Q3 to land kind of mid- to high teens, so ***incredibly strong***. So this is really tied to retail -- so specifically one, but a couple of retailers holding on kind of protecting themselves coming out of capacity constraints. They were a little bit hoarding inventory to make sure that they didn't run out of stock on shelf. And then we've now showed over several quarters of high in-stock rates and so they felt comfortable about bringing them down.
>
> We thought this could happen. We just had no idea when it would happen. And so -- and we're seeing it. ***But absolutely, no softness, no concern around consumption.***

130. Davenport further stated that BellRing's "***consumption remain resilient and strong***."

131. Davenport's statements referenced above in ¶¶129-130 that "there's really no change in consumption," "we're expecting to continue to see strong consumption," "absolutely, no softness, no concern around consumption," and "consumption remain[s] resilient and strong" were materially false and misleading when made. Contrary to those assurances, Defendants knew, or recklessly disregarded, that: (i) contemporaneous Numerator data showed that Premier Protein consumption was already weakening across multiple independent measures of consumer demand, including brand shifting, category expansion/contraction, and category churn;[7] (ii) contemporaneous Circana data showed that Premier Protein sales growth and market share had

[7] As set forth in ¶47, Circana provides the same data on brand shifting, category expansion/contraction, and category churn. Defendants accordingly possessed data showing deterioration of these key metrics not just through Numerator but also through Circana.

sharply declined in the weeks immediately preceding the May 6, 2025 earnings call; (iii) new competitors had entered the market since November 2024; and (iv) BellRing's reported consumption was being artificially supported by massive and unsustainable promotional activity.

132. As alleged in ¶¶69-78 above, Numerator data in Defendants' possession showed that consumption was weakening by May 6, 2025. This data show, among other things:

a. Brand Shifting: By 1Q 2025, volume in Premier's all-important club channels was not growing but in a state of decline compared to the prior year because customers were leaving for competitors. This decline more than doubled to 2.8% in 2Q 2025. The same downward trends were visible for data across all Premier's distributors. *See* ¶¶72-77.

b. Category Expansion/Contraction: In 1Q 2025, existing customers bought 11.9% more volume than the same quarter in the prior year. However, by 2Q 2025, this number nearly halved to 7.3%. The same downward trends are visible for data from Premier's all-important club channels. *See* ¶¶73-74, 77.

c. Category Churn: In 1Q 2025, new customers purchased 22.4% more volume than the same quarter the prior year. By 2Q 2025, this number plummeted to 16.6%. The same downward trends are visible for data from Premier's all-important club channels. *See* ¶¶75-77.

133. Defendants also knew, or recklessly disregarded, that Davenport's statements referenced above in ¶¶129-130 were materially false and misleading when made because they possessed Circana data as of May 6, 2025 showing that BellRing's market share had significantly declined in April 2025. As alleged in ¶48, Circana data was available to Defendants with only approximately a one-week reporting lag. Accordingly, by May 5, 2025, the day before the May 6, 2025 earnings call, Defendants had access to Circana market share data through at least April 27,

2025. That contemporaneous Circana data showed that Premier Protein's sales growth and market share had sharply declined in the weeks immediately preceding the May 6, 2025 earnings call. Specifically, between March 31, 2025 and April 27, 2025, Premier Protein's market share declined by nearly 5% to levels not seen since July 2024. *See supra* ¶¶88-89. Defendants did not disclose this adverse trend during the May 6, 2025 earnings call or in BellRing's accompanying investor presentation. Instead, Defendants disclosed the trend approximately three months later in the tables included in the investor presentation accompanying BellRing's August 5, 2025 earnings call for 3Q 2025, as set forth in the chart below.

**Defendants' Investor Presentation from 3Q 2025 Shows that They Knew About the Significant Drop in April Market Share Based on Circana Data**




Defendants Knew that Market Share Had Already Declined ~5% in April

134. Further, the statements referenced above in ¶¶129-130 were materially false and misleading when made because Defendants knew that new competitors had entered the convenient nutrition category and that this was affecting consumption. During BellRing's earnings call for 2Q 2026 on May 5, 2026, Davenport admitted that BellRing internally tracks competitors and that "***around 40 new competitors***" had entered the category "***over the last 18 months.***" Davenport further added, "***So it's tremendous. And as the number one player, we are going to get affected by that***."[8] Davenport's admission confirms that new competitors were entering the convenient nutrition category as early as November 2024 – six months before Defendants falsely stated during their May 2025 earnings call that "there's really no change in consumption," "we're expecting to continue to see strong consumption," "absolutely, no softness, no concern around consumption," and "consumption remains resilient and strong" – and that "***as the number one player, we are going to get affected by that.***"

135. In addition, Davenport's statements referenced above in ¶¶129-130, concerning BellRing's purportedly "strong consumption" and lack of "softness," were also materially false and misleading because Defendants knew, or recklessly disregarded, that BellRing's reported consumption and sales growth were being artificially supported by massive and unsustainable promotional activity by May 2025. Defendants knew that the convenient nutrition category "is usually not that promotionally driven" and that the norm is "about 25% to 30% sold on deal." Defendants also knew that engaging in promotional activity above this level was "less rational"

---

[8] Davenport has admitted for years that the Company tracks competitors, as reflected in her statements during earnings calls. For instance, during BellRing's earnings call for 4Q 2021 / FY 2021 on November 19, 2021, Davenport told investors that "competitors have followed in the RTD space." Likewise, during BellRing's earnings call for 1Q 2023 on February 7, 2023, Davenport told investors that the "competitive environment hasn't changed a ton since kind of the last quarter and before." This reflects the fact that monitoring competitors is a core component of BellRing's business.

and "not acting very rationally." Nonetheless, unbeknownst to investors, BellRing was regularly "selling on deal" upwards of 50% of its products beginning in 2Q 2025, a level far exceeding the approximately 25% to 30% industry norm Defendants themselves identified. This metric, referred to as the volume of sales on promotion, reflects the extent to which reported consumption was being driven by temporary price discounts rather than underlying consumer demand.

136. By the time of BellRing's earnings call for 2Q 2025 on May 6, 2025 Defendants' own contemporaneous Circana data showed that BellRing's reported consumption and sales growth had become materially dependent on elevated promotional activity rather than underlying consumer demand. Specifically, the percentage of Premier Protein sales occurring on promotion increased sharply during this period, rising from approximately 19% in December 2024 to 48% in January 2025, and reaching approximately 54% in March 2025. Even in February 2025, approximately 29% of Premier Protein sales occurred on promotion, nearly double the approximately 14% promotional level during the prior year (15%).

137. Likewise, contemporaneous Circana data available to Defendants by May 6, 2025 showed that BellRing's sales growth closely tracked changes in promotional activity, demonstrating that the Company's reported consumption and sales growth were materially dependent on elevated promotions rather than underlying consumer demand:

a. Between January and February 2025, BellRing had reduced its volume of sales on promotion from 48% to 29%. This immediately led to a ***-7%*** drop in sequential sales growth in February, as reflected in the tables below:

**Figure 2: Average weekly sequential sales growth – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Jan (5 weeks) | 30% | 30% |
| Feb (4 weeks) | -7% | -13% |
| Mar (4 weeks) | 31% | 29% |
| Apr (4 weeks) | -24% | -16% |

*Source: Circana, Evercore ISI Research*

**Figure 3: Percent volume on promotions – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Dec (4 weeks) | 19% | 20% |
| Jan (5 weeks) | 48% | 45% |
| Feb (4 weeks) | 29% | 15% |
| Mar (4 weeks) | 54% | 39% |
| Apr (3 weeks) | 35% | 23% |
| July (4 weeks) | 33% | 32% |
| August (2 weeks) | 57% | 17% |

*Source: Circana, Evercore ISI Research*

Likewise, between March and April 2025, BellRing reduced its volume of sales on promotion from 54% to 35%. This immediately led to a ***-24%*** sales drop in April, as reflected in the tables below:

**Figure 2: Average weekly sequential sales growth – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Jan (5 weeks) | 30% | 30% |
| Feb (4 weeks) | -7% | -13% |
| Mar (4 weeks) | 31% | 29% |
| Apr (4 weeks) | -24% | -16% |

*Source: Circana, Evercore ISI Research*

**Figure 3: Percent volume on promotions – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Dec (4 weeks) | 19% | 20% |
| Jan (5 weeks) | 48% | 45% |
| Feb (4 weeks) | 29% | 15% |
| Mar (4 weeks) | 54% | 39% |
| Apr (3 weeks) | 35% | 23% |
| July (4 weeks) | 33% | 32% |
| August (2 weeks) | 57% | 17% |

*Source: Circana, Evercore ISI Research*

138. Furthermore, the Defendants did not only make false and misleading statements about the state of Premier Protein's consumption during the May 6, 2025 earnings call. The Defendants also falsely and misleadingly concealed the scope of BellRing's promotional activity during 2Q 2025. During the May 6, 2025 earnings call, Defendants acknowledged that increased growth was partially attributable to promotions, but concealed that promotional activity had been significantly elevated throughout most of the quarter. In connection with BellRing's 2Q 2025 earnings call, Defendants issued a Second Quarter Fiscal Year 2025 Supplemental Investor Presentation, that purported to identify which months promotions were in effect during 2Q 2025. The 2Q 2025 presentation indicated that "Club Promotions" occurred ***only*** in March 2025, as reflected below:

**Defendants Falsely Omitted that Club Promotions Were Occurring for Most of 2Q 2025 in Their Investor Presentation**



139. The chart in the investor presentation in ¶138 above was materially false and misleading because Defendants knew, or recklessly disregarded, that the investor presentation omitted the massive promotions that took place in January and February 2025. By representing that "Club Promotions" were limited only to March 2025, Defendants falsely minimized the extent to which promotions were also propping up sales in January and February 2025. Moreover, had investors been informed of the full scope of promotions, they would have learned that BellRing's market share remained largely flat despite elevated promotions, evidencing weakness in underlying consumer demand.

*3Q 2025 Earnings Call and Financial Statements*

140. Defendants partially revealed the truth about weakening consumption and the role of promotional activity in artificially propping up BellRing's sales in connection with the Company's financial 3Q 2025 results. On August 4, 2025, after market hours, BellRing reported its fiscal 3Q 2025 financial results and held an earnings conference call the following morning, August 5, 2025, to discuss the results.

141. During the August 5, 2025 earnings call, Rode announced that BellRing had lowered its fiscal year 2025 guidance. Davenport attributed the disappointing new sales outlook to increased competition. In her prepared remarks, Davenport stated, "[s]uccess attracts competition" and "it is not surprising to see new protein RTDs enter[ed] the [convenient nutrition] category, especially in its biggest channel, club." Davenport further attributed the changes in guidance to "the inevitability of increased competition."

142. Davenport further revealed the Company's 2Q 2025 promotional activity had been more extensive than previously represented. During the earnings call, Stephens Inc. analyst, Jim Salera, asked Davenport to "offer any thoughts on how we should think about promotional cadence

going forward." In response, Davenport admitted that "we up-leveled our Q4 club promotions" and the "biggest promotional period is that ***January, February***, March."

143. Defendants further disclosed the previously omitted promotional activity from 2Q 2025 in the investor presentation accompanying BellRing's 3Q 2025 earnings call. BellRing's 3Q 2025 presentation showed "Major Club Promotions" in both January 2025 and February 2025, even though BellRing's prior 2Q 2025 investor presentation had indicated that "Club Promotions" occurred ***only*** in March 2025. The charts below provide a side-by-side comparison of BellRing's investor materials from 2Q 2025 (which falsely omitted promotions in January 2025 and February 2025) and BellRing's investor materials from 3Q 2025 (which disclosed that "Major Club Promotions" occurred during those months).

**Defendants Partially Admitted the Truth in Their 3Q 2025 Investor Presentation About Previously Undisclosed Club Promotions**




2Q 2025 Investor Materials Falsely ***Omitted* Major** Club Promotions for Most of 2Q 2025

By comparison, 3Q 2025 Investor Materials ***Admitted*** that There Were **Major** Club Promotions for Most of 2Q 2025

144. On this news, the price of BellRing stock declined $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

145. Despite these partial admissions, Defendants continued to mislead investors about competition and the Company's use of massive, unsustainable promotions. During the August 5, 2025 earnings call for 3Q 2025, Davenport attributed increases in "club competition" to a "unique" and temporary situation involving one retailer, stating in pertinent part, as follows:

> Sure, Megan. ***I'm going to start with the club competition because I think there's some context that might be helpful***. And then I'll end with just our efforts around where we want to be in the store, what's important and then lastly single serve. So if I don't hit all those points, tell me. Okay. So let me -- ***first with the kind of club situation because it's kind of unique***. So I mentioned that ***when we gained our short-term club palette, several other competitors also gain some space***. So one of our key club retailers decided to increase the RTD and powder floor space in Q3 and for a short-term basis.
>
> ***It's a temporary expansion to fill spots previously meant for tariff-impacted categories***. So it's a little bit unique. It's supposed to last until the end of the calendar year. So it is -- we gained some space, but also some competitors gained some space because they had all this new space to fill. ***So it's a little bit of a unique scenario, and I think that's what I think people are -- we're seeing the increased competition***. I will say that I was in a club store this weekend. And it is really -- it is great for the category. When I was walking around I bet you 60% to 70% of the parts in the store had high protein shakes in the cart, which -- and people -- it's completely mainstreamed. And so I truly believe that the competition is good for the category. ***And I think that this is sort of a unique situation where the competition is, especially in that channel is kind of increasing for a short period of time because of this unique situation and then will come down a little bit***. So it's a little different in other channels where you have to wait for resets, and those just happened a little more slowly. So that's one piece that I think is important context.

146. The "key club retailer" described above is Costco. Davenport's statements referenced above in ¶145 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that increased competition in the club channel was neither temporary nor "unique" to a short-term merchandising reset at one retailer. Rather, as alleged in

¶¶69-77 above, BellRing had been experiencing increasing competitive pressure across the convenient nutrition category for multiple quarters, including within its most important club channels. Defendants' own contemporaneous Numerator data showed that by 1Q 2025, Premier Protein's volume in club channels had already begun declining year-over-year as consumers shifted to competing products. That rate of decline more than doubled to 2.8% in 2Q 2025 and worsened to 4.9% by 3Q 2025.

147. Moreover, Defendants knew, or recklessly disregarded, that increasing competition in the convenient nutrition category was not a temporary or retailer-specific issue, but instead reflected a sustained influx of new entrants that was already eroding BellRing's market position and consumption trends during fiscal 2025. During BellRing's earnings call for 2Q 2026 on May 5, 2026, Davenport admitted that BellRing internally tracks competitors and that "around 40 new competitors" had entered the category "over the last 18 months." Davenport further added, "So it's tremendous. And as the number one player, we are going to get affected by that." Davenport's statement confirms that BellRing had been facing mounting competitive pressure from new competitors since at least late 2024 – contrary to Defendants' statements during BellRing's August 5, 2025 earnings call for 3Q 2025 that increased "club competition" reflected a "unique" and temporary situation involving one retailer.

148. In addition to making false and misleading statements about competition during the August 5, 2025 earnings call, Defendants also continued to minimize BellRing's promotional activity. Among other things, Rode assured investors that "Premier Protein is lifted by distribution gains and ***incremental promotional activity as we return to historical promotional levels***."

149. Rode's statements referenced above in ¶148 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's promotional

activity was neither "incremental" nor consistent with a "return to historical promotional levels." As alleged in ¶¶81-90 above, Defendants' Circana data showed that the percentage of Premier Protein sales occurring on promotion increased sharply during this period, rising from approximately 19% in December 2024 to approximately 48% in January 2025 and reaching approximately 54% by March 2025, and remaining materially elevated thereafter.

*4Q 2025 and FY 2025 Earnings Call and Financial Statements*

150. Defendants continued to partially reveal the truth about weakening consumption, intensifying competition, and BellRing's reliance on unsustainable promotional activity during the Company's subsequent earnings call for 4Q 2025. After the close of trading on November 17, 2025, BellRing reported its 4Q 2025 and FY 2025 financial results.

151. During the November 18, 2025 earnings call, Defendants admitted BellRing was experiencing increasing competition and that next year's sales would decline. Davenport stated, "[I]n the near term, we are expecting a more competitive environment." Davenport further stated that BellRing was setting 2026 "net sales guidance" at a "range of 4% to 8% growth," which was "[a]t the midpoint." Davenport explained that "sales for the year are expected to be modestly below our long-term algorithm because of the softer first quarter driven by specific items and near-term competitive dynamics." Davenport continued that BellRing expected, "roughly 5% decrease in net sales."

152. Davenport further admitted that BellRing would not sustain prior promotional levels. *See* ¶¶81-90. Specifically, Rode stated that "Consumption growth for Premier Protein shakes is expected to be flat" during 1Q 2026 because BellRing had "chose[n] not to repeat promotions for Premier and Dymatize" from 1Q 2025. Rode added that "[t]ogether, the non-repeating promotions and sales pull forward are a 4-percentage-point headwind to our first quarter growth." Davenport additionally explained that BellRing expected "tough club comps." because

"that club promotion" was "not recurring," and therefore expected "slightly negative kind of low single digits" consumption trends continuing through November.

153. Davenport further revealed that the convenient nutrition category does not ordinarily rely on extensive promotional activity, thereby underscoring how unusual BellRing's undisclosed fiscal 2025 promotional levels had become. As Davenport admonished analysts:

> I would just say that just remember that this category is actually fairly low promotion compared to many categories. It's just about 25% to 30% sold on deal. So just keep that in mind as you're thinking about just this category kind of in the macro.

154. On this news, the price of BellRing stock declined $3.17 per share, or more than 12%, from $25.62 per share on November 17, 2025, to an intraday low of $22.45 per share on November 18, 2025, on unusually heavy trading volume.

155. Despite these disclosures, BellRing's stock price remained artificially inflated because Defendants continued to falsely assure investors that BellRing's growth trajectory and competitive position remained strong and that promotional activity during the quarter had been merely "incremental." During the November 18, 2025 call, analyst Steve Powers at Deutsche Bank AG stated, "I think it's fair to say that a lot has changed over the last six months in your categories and around your business," and asked Davenport to summarize what had changed and how it affected BellRing's 2026 plans.

156. In response, Davenport attempted to minimize the deterioration in BellRing's business and competitive position, stating, "I would actually start with what has not changed." Davenport continued, "The last three quarters are much like every other quarter that we've had, which has strong, strong growth."

157. Analysts also questioned Defendants concerning the increasing number of "new entrants" and "insurgents" entering BellRing's largest club customer and the resulting competitive

pressure facing the Company. Specifically, Barclays analyst Andrew Lazar noted that Defendants previously lacked "clarity" regarding the "the repeat rate for some of the new entrants or the insurgents that have come into the category, particularly your largest customer," and asked about what those competitive dynamics meant for BellRing's largest club customer, including the implications for BellRing's expected shelf position going forward.

158. Davenport responded by falsely minimizing the competitive threat facing BellRing, stating: "When we look at the interaction between us and many of the competitors, we have a clear position and our repeat rates are only getting stronger. ***And we are sourcing some volume from those competitors***."

159. The statements referenced above in ¶¶156 to 158 that BellRing had experienced "strong, strong growth" over the prior three quarters and was "sourcing some volume" from competitors were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's growth and competitive position were materially weaker than represented. Contrary to those statements, the true facts which were known to, or recklessly disregarded by, Defendants were that:

a. As set forth in ¶¶69-77 above, Premier Protein's key consumption metrics, including category churn, category expansion/contraction, and brand shifting were all declining beginning as early as 1Q 2025 and continued to decline throughout 3Q 2025;

b. As set forth in ¶¶80-90 above, BellRing's reported growth from 1Q 2025 to 3Q 2025 was materially supported by massive and unsustainable promotional activity;

c. As set forth in ¶¶69-77 above and in the chart below, Premier Nutrition was consistently losing volume to competitors across BellRing's core channels during fiscal 2025

("brand shifting"), contrary to Defendants' representation that BellRing was "sourcing" volume from competitors; and




d. As set forth in ¶¶162-170 below, BellRing was facing substantial pressure from a sustained influx of new entrants into the convenient nutrition category. Indeed, during BellRing's 2Q 2026 earnings call on May 5, 2026, Davenport admitted that BellRing internally tracks competitors and that "***around 40 new competitors***" had entered the category "***over the last 18 months.***" Davenport further added, "***So it's tremendous. And as the number one player, we are going to get affected by that***." Davenport's admission confirms that BellRing had been facing substantial competitive pressure from new entrants since at least late 2024 – contrary to Davenport's statements during the November 18, 2025 earnings call that BellRing had experienced "strong, strong growth" over the prior three quarters and was "sourcing some volume" from competitors.

160. Defendants also continued to materially mislead investors by minimizing the extraordinary scope of promotions during the November 18, 2025 earnings call. Davenport stated, "ready-to-drink shake category grew 15%, while Premier shake consumption grew 20%, driven by ***incremental promotion events***." Rode similarly stated, "RTD shake sales grew 14%, driven

by volume growth from ***incremental promotional events*** and distribution gains offset partially by unfavorable price mix."

161. The statements referenced above in ¶160 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that BellRing's promotional activity was not "incremental," but instead had reached historically elevated and unsustainable levels. Merriam-Webster's Dictionary defines the word incremental as "relating to, being, or occurring in ***especially small increments***." As alleged in ¶¶81-90 above, Defendants' own Circana data showed that the percentage of Premier Protein sales occurring on promotion reached approximately 57% by August 2025, nearly double both BellRing's historical levels and the approximately 25% to 30% category norm Defendants themselves identified, and nearly 3 times higher than BellRing's sales on promotion in August 2024. Defendants further knew that such elevated promotional activity was materially driving reported consumption and sales growth.

**Figure 3: Percent volume on promotions – Premier Protein**

| | 2025 | 2024 |
|---|---|---|
| Dec (4 weeks) | 19% | 20% |
| Jan (5 weeks) | 48% | 45% |
| Feb (4 weeks) | 29% | 15% |
| Mar (4 weeks) | 54% | 39% |
| Apr (3 weeks) | 35% | 23% |
| July (4 weeks) | 33% | 32% |
| August (2 weeks) | 57% | 17% |

*Source: Circana, Evercore ISI Research*

*1Q 2026 Earnings Call and Financial Statements*

162. Defendants continued to partially reveal the truth about Premier Protein's weakening consumption, increased competition, and reliance on unprecedented and unsustainable promotions in its financial filings with the SEC and earnings call with investors the next quarter. After the close of trading on February 3, 2026, BellRing reported its 1Q 2026 financial results. During the earnings call the same day, Davenport stated, "Today, we have narrowed our range of

our 2026 net sales guidance to between 4%-6% growth." Davenport attributed this anticipated decline in sales to "more frequent promotional events from Insurgent Brands than expected." Rode, in turn, confirmed that BellRing had "chose[n] not to repeat promotions for Premier" from 1Q 2025.

163. Davenport further acknowledged that the category is not ordinarily promotion-driven, stating that the "category actually -- is usually not that promotionally driven" and "it's about 25% to 30% sold on deal," and that relative to other categories, such promotional levels are "pretty low." Davenport stated that competitors were beginning to engage in promotions above the 25-30% level, which Davenport characterized as "less rational":

> [T]his year is higher, as I've mentioned, the reason. As far as rational actors, yeah, I would say that some of the insurgent brands are less rational. And I think that we expected some of that. [B]ecause they are trying to gain trial. And so they're going to be spending to do so . . . . once retailers' kinda of consolidate around the best - performing brands, this heightened promotion should eventually come down.

164. On this news, the price of BellRing stock declined $3.51 per share, or nearly 14%, from a close at $24.39 per share on February 2, 2026, to close at $20.88 per share on February 3, 2026, on unusually heavy trading volume. The price of BellRing common stock, however, remained artificially inflated because, among other things, Defendants continued to misrepresent the risks the Company faced from competitors.

165. Despite these disclosures, BellRing's stock price remained artificially inflated because Defendants continued to falsely minimize the effects of competition on Premier Protein's consumption. During the February 3, 2026 earnings call, an analyst from Morgan Stanley asked Davenport "what's going on in the club channel" and to explain "weakness" in Premier Protein's consumption. Davenport responded by attributing the weakness to a "timing delay in setting up that mass promo" and "small impact" from promotions by "insurgent brands." Additionally, Davenport engaged in the following exchange with an analyst during the call:

Brian Holland D.A. Davidson & Company – Analyst

Maybe just to clarify, first, Darcy, high level. Obviously, the consumption inflection second half of December, January was not to where you thought it would be. And obviously, you've explain some of the reasons that might be. So I just wanted to isolate and ask whether the mass merchandise -- mass retailer merchandising event whether that is performing to expectation and it was maybe impacted by, like you said, the lag in rollout or what's happening in club? ***Or is competitive activity in that mass retailer***, where we're seeing a bunch of rollbacks, et cetera, ***is that weighing on the actual performance at that customer relative to expectations?***

Darcy Davenport BellRing Brands Inc - President, Chief Executive Officer, Director

So in the mass retailer, the delay, the kind of ***delay was the biggest contributor to the softer consumption. Small impact from increased from competition***, but the larger was the timing. And I would say now that we are fully set up -- the event is hitting our expectations. So like I said, ***the bigger reason was just the delay***.

166. The statements referenced in ¶165 above were materially false and misleading when made because Davenport minimized the impact of mounting competitive pressures by characterizing the issue as "small" and attributing softer consumption primarily to a "delay." Davenport omitted that BellRing was facing significant and intensifying competition from approximately 40 insurgent competitors that were aggressively promoting their products. Davenport further knew, or recklessly disregarded, that these competitive pressures were materially affecting Premier Protein's consumption trends and market position.

167. The Defendants then finally revealed the truth in connection with BellRing's financial results for the second quarter of fiscal 2026 ("2Q 2026"). On May 4, 2026, after the close of trading, BellRing reported its 2Q 2026 financial results in a Form 10-Q and a press release furnished to the SEC on a Form 8-K (the "May 2026 Form 8-K").

168. The next day, during the May 5, 2026 earnings call, Davenport revealed that "[o]ur second quarter results came in below our expectations, and we are disappointed with our results. We faced a challenging operating environment, as multiple dynamics pressured our financial

results. While net sales grew 2%, which was only modestly below expectations, the mix of our revenues differed meaningfully from both our forecast and what we've seen historically." Davenport then revealed the full extent to which BellRing's consumption had long been weakening as a result of increased competition: "***I think our latest estimates were internally somewhere around 40 new competitors over the last 18 months. So it's tremendous. And as the number one player, we are going to get affected by that***."

169. Following this admission, analyst Steve Powers from Deutsche Bank asked Davenport "to clarify a little bit more" about what, if anything, had changed during the quarter. While Davenport stated that BellRing's costs had increased and there was "increased consumer price sensitivity," Davenport did not state that any of the 40 new competitors had entered the category during the quarter. As such, the "tremendous" effects of competition were not limited to 2Q 2026 but were rather a longstanding, undisclosed phenomenon that significantly pre-dated the quarter.

170. Davenport further stated that reliance on elevated promotions was unsustainable – despite BellRing's undisclosed practice of selling upwards of 57% of volume on promotion in FY 2025. During the earnings call, Davenport criticized competitors for selling just 27% of their products on promotion. As Davenport stated, "smaller entrants[] continued to invest aggressively to gain traction" and "[a]s a result, 27% of RTD shake category volumes were sold on price promotion, up 8 percentage points versus last year and a meaningful step-up from Q1." Davenport further stated that selling 27% of products on promotion was a "big number" and that competitors were "not acting very rationally." Davenport added BellRing "did not add any more events to compete."

171. On this news, the price of BellRing stock declined $6.73 per share, or nearly 39%, from a close at $17.36 per share on May 4, 2026, to close at $10.63 per share on May 5, 2026, on unusually heavy trading volume.

**Defendants' Quarterly and Annual Filings Omitted Known Trends and Uncertainties in Violation of SEC Disclosure Regulations, Thereby Making BellRing's Financial Statements Materially Misleading**

172. BellRing's quarterly and annual filings were required to disclose information pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, governing Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). Item 303 requires issuers to:

> Describe any known trends or uncertainties that have had or that [the registrant reasonably expects will have] a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

17 C.F.R. §229.303(b)(2)(ii).

173. The SEC's interpretive guidance associated with Item 303 states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

174. Put simply, Item 303 requires disclosure of material trends and uncertainties where reported financial results are not indicative of future performance.

175. As the SEC has explained: "discussion and analysis of known trends," is "one of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results." The SEC further emphasizes that "[a]scertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A." Accordingly, disclosure decisions concerning trends, demands,

commitments, events and uncertainties generally should involve the: (i) consideration of financial, operational and other information known to the company; (ii) identification, based on this information, of known trends and uncertainties; (iii) assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations.

176. As the SEC's guidance has explained:

> Disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

177. Consistent with this framework, Instruction 3 to Item 303 requires that MD&A "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

178. BellRing's quarterly and annual filings were materially misleading because they failed to disclose known trends and uncertainties that Defendants knew were materially impacting, and were reasonably likely to materially impact, the Company's net sales and revenues. In particular, and as set forth below, Defendants' filings were materially misleading with respect to: (i) the true source of BellRing's sales growth between 3Q 2024 and 1Q 2025; and (ii) the unsustainable nature of BellRing's promotional activity between 2Q 2025 and 4Q 2025.

179. **The Source of BellRing's Sales Growth**: BellRing's quarterly and annual filings between 3Q 2024 and 1Q 2025 misrepresented the source of the Company's sales growth.

180. Once BellRing demonstrated sustained in-stock levels, Defendants later admitted that the increase in Premier Protein's increase sales beginning in summer 2024 was driven by retailers "hoarding" inventory. Defendants further admitted in the May 2025 earnings call that

they knew that they understood this inventory build would reverse, as retailers would "lower[] their weeks of supply on hand" once BellRing demonstrated sustained in-stock levels. As Davenport admitted, "We thought this could happen. We just had no idea when it would happen." Defendants further knew that retailers' excess inventory levels were temporary and unsustainable because it is not economically rational for retailers to hold excess inventory for extended periods of time and Defendants knew that retailers had "destocked" excess inventory several times in BellRing's history, including during 2Q 2020, 3Q 2020, and 1Q 2023.

181. This retailer inventory build, and the resulting, inevitable destocking, constituted a known trend or uncertainty reasonably likely to have a material unfavorable impact on BellRing's future net sales and revenues. Item 303 required Defendants to disclose this trend in the MD&A sections of their filings. Defendants failed to do so.

182. This omission rendered Defendants' statements concerning the drivers of BellRing's sales growth materially misleading. In particular, the MD&A sections of the Company's filings attributed growth to production, distribution, and promotional activity, while omitting the material impact of unsustainable retailer inventory accumulation:

- 3Q 2024 Form 10-Q (Aug. 6, 2024): "Sales of Premier Protein products were up $72.3 million, or 20%, driven by 19% higher volumes ***primarily due to higher RTD shake production and distribution gains***."

- FY 2024 Form 10-K (Nov. 19, 2024): "Net sales increased $329.4 million, or 20%, during the year ended September 30, 2024 compared to the prior year. Sales of Premier Protein products were up $317.8 million, or 23%, driven by 25% higher volumes ***primarily due to increased promotional activity*** (which resulted in lower average net selling prices), ***higher RTD shake production and distribution gains***."

- 1Q 2025 Form 10-Q (Feb. 4, 2025): "Sales of Premier Protein products were up $96.0 million, or 26%, driven by 21% higher volumes. Volumes increased ***primarily due to distribution gains and incremental promotional activity***."

183. These statements were materially misleading because they failed to disclose that a material portion of the reported volume growth was driven by temporary and unsustainable retailer hoarding, rather than underlying consumer demand.

184. **The Unsustainability of Promotions:** BellRing's quarterly and annual filings between 2Q 2025 and 4Q / FY 2025 were further materially misleading because they attributed sales growth to promotional activity while omitting that such activity was extraordinary, unsustainable, and materially distorting reported results.

185. As alleged in ¶¶81-86, Defendants knew that their use of massive promotions to prop up sales was unsustainable. Defendants acknowledged that the convenient nutrition category is "usually not that promotionally driven," with approximately 25% to 30% sold on deal, and that higher levels are "less rational" and "not acting very rationally." The magnitude of this shift was substantial. The percentage of Premier Protein sold on promotion increased from approximately 19% in December 2024 to 48% in January 2025, reached 54% by March 2025, and peaked at approximately 57% in August 2025. Even outside these peak periods, promotional activity remained materially elevated relative to both industry norms and BellRing's historical levels.

186. Moreover, as alleged in ¶¶81-83, Defendants knew that these levels of promotional activity were unsustainable based on BellRing's experience with promotions in 2021, which were "heavy on promotion" and had been "subsidizing volume." The economic effects of such promotions were also well-understood by Defendants, who have decades of experience in consumer goods. As alleged in ¶¶87-88, price discounts generate short-term increases in unit volume by accelerating purchases and shifting demand across periods, rather than creating durable increases in underlying consumption.

187. This sustained promotional intensity constituted a known trend or uncertainty reasonably likely to materially impact BellRing's future net sales and revenues, as such promotions artificially inflate short-term sales while pulling forward demand and reducing future purchasing. Item 303 required Defendants to disclose the unsustainable nature of this promotional activity. Defendants failed to do so.

188. This omission rendered Defendants' statements concerning the drivers of BellRing's growth materially misleading. In particular, the MD&A sections of the Company's filings attributed growth to promotional activity while failing to disclose that such promotions were extraordinary, unsustainable, and not indicative of underlying demand or future performance:

- 2Q 2025 Form 10-Q (May 6, 2025): "Sales of Premier Protein products were up $92.3 million, or 22%, ***driven by 15% higher volumes primarily due to higher RTD shake production, distribution gains and increased promotional activity***."
- 3Q 2025 Form 10-Q (Aug. 5, 2025): "Sales of Premier Protein products were up $26.3 million, or 6%, ***driven by 3% higher volumes primarily due to distribution gains and incremental promotional activity***."
- FY 2025 Form 10-K (Nov. 18, 2025): "Sales of Premier Protein products were up $286.3 million, or 17%, ***driven by 15% higher volumes primarily due to distribution gains and incremental promotional activity***."

**Defendants' Quarterly and Annual Filings Omitted to Include Significant Factors that Made the Investment Risky, Thereby Making BellRing's Financial Statements Materially Misleading**

189. Pursuant to Item 1A of Form 10-K and Item 1A of Form 10-Q, BellRing was required to disclose the material factors that made an investment in the Company speculative or risky, including any material changes to previously disclosed risk factors. *See* 17 C.F.R. §229.105.

190. BellRing's Risk Factors were materially false and misleading because they described risks as hypothetical that had, in fact, already materialized.

191. Throughout the Class Period, BellRing's filings included substantially similar boilerplate risk disclosures, including risks relating to: (i) competition and the Company's ability

to maintain market position; (ii) the loss or reduction of purchases by major customers; and (iii) fluctuations in business due to changes in promotional activity and pricing:

> Our financial condition, results of operations and cash flows ***may differ*** materially from those in the forward-looking statements. Such statements are based on management's current views and assumptions and involve risks and uncertainties that ***could affect*** expected results. Those risks and uncertainties include, but are not limited to, the following:
>
> * * *
>
> - BellRing's ability to continue to compete in its product categories and its ability to retain its market position and favorable perceptions of its brands;
>
> * * *
>
> - the loss of, a significant reduction of purchases by or the bankruptcy of a major customer;
>
> * * *
>
> - fluctuations in BellRing's business due to changes in its promotional activities and seasonality;
> - BellRing's ability to maintain the net selling prices of its products and manage promotional activities with respect to its products;

192. These disclosures were materially misleading because Defendants knew, but failed to disclose, that these risks had already occurred. Among other things, Defendants knew that: (i) retailers would reduce purchases as inventory levels normalized following the period of hoarding; (ii) underlying consumer demand was weakening; and (iii) BellRing's sales were being sustained by massive and unsustainable promotional activity.

193. **Retailer Hoarding**: BellRing's risk disclosures warned that a "significant reduction of purchases by . . . a major customer" could affect results. These statements were materially misleading because Defendants knew by at least summer 2024 that such a reduction would occur.

194. As Defendants later admitted, retailers had increased inventory levels during the second half of 2024 and subsequently began reducing those levels. During the May 2025 earnings call, Rode explained that retailers had "leaned into inventory weeks of supply" and were now "optimiz[ing]," resulting in reduced orders and a mid-single-digit headwind to 3Q 2025 growth.

195. Davenport similarly admitted that retailers "were a little bit hoarding inventory to make sure that they didn't run out of stock on shelf. And then we've now showed over several quarters of high in-stock rates and so they felt comfortable about bringing them down." Davenport further acknowledged that Defendants understood this dynamic would occur, stating: "We thought this could happen. We just had no idea when it would happen. And so — and we're seeing it."

196. Defendants further knew that retailers' excess inventory levels were temporary and unsustainable because it is not economically rational for retailers to hold excess inventory for extended periods of time and Defendants knew that retailers had "destocked" excess inventory several times in BellRing's history, including during 2Q 2020, 3Q 2020, and 1Q 2023.

197. Because retailers' inventory reduction was both known and inevitable, Defendants' warnings that a reduction in purchases merely "may" occur were materially misleading.

198. **Weakening Consumption**: BellRing's risk disclosures warned that competition and loss of market position could impact results. These statements were materially misleading because Defendants knew by at least 1Q 2025 that competition was already eroding demand.

199. As alleged in ¶¶69-77, Numerator data, on which Defendants repeatedly represented they relied to monitor consumer demand, competitive dynamics, and purchasing behavior shows that consumption of Premier Protein was falling across several key metrics

including brand shifting, category expansion/contraction, and category churn, beginning in 1Q 2025.[9] These trends continued to accelerate throughout the remainder of the year.

200. Defendants further knew that this weakening consumption was being masked by elevated promotional activity. As alleged in ¶¶81-83, Davenport acknowledged that the convenient nutrition category "is usually not that promotionally driven" and that the norm is "about 25% to 30% sold on deal," and further acknowledged that promotional levels above that range are "less rational" and "not acting very rationally." *See* ¶¶81, 85-86. Nonetheless, BellRing was regularly "selling on deal" in excess of 50% of its products beginning in early 2025, including an increase from approximately 19% in December 2024 to approximately 48% in January 2025, and exceeding 50% thereafter. These elevated promotions artificially supported reported consumption despite weakening underlying demand.

201. Likewise, during BellRing's May 2026 earnings call, Davenport admitted that BellRing internally tracks competitors and that "***around 40 new competitors***" had entered the category "***over the last 18 months.***" Davenport further added, "***So it's tremendous. And as the number one player, we are going to get affected by that***." Davenport's admission confirms that new competitors were entering the convenient nutrition category as early as November 2024 and that "***as the number one player, we are going to get affected by that.***"

202. Because Defendants knew that competition was already eroding demand and that reported consumption was being artificially sustained by promotions, their warnings that such risks merely "may" impact results were materially misleading. BellRing did not update its risk disclosures to reflect that its ability to compete and maintain demand was already deteriorating.

[9] As set forth in ¶47, Circana provides the same data on brand shifting, category expansion/contraction, and category churn. Defendants accordingly possessed data showing deterioration of these key metrics not just through Numerator but also through Circana.

203. **Massive and Unsustainable Promotions:** BellRing's risk disclosures further warned that fluctuations in promotional activity and the Company's ability to manage promotions could impact results. These statements were materially misleading because Defendants knew by at least 2Q 2025 that BellRing's promotional activity had reached extraordinary and unsustainable levels.

204. As alleged in ¶¶81, 85-86, Defendants' Circana data showed that the percentage of Premier Protein sold on promotion increased dramatically during this period, rising from approximately 19% in December 2024 to approximately 48% in January 2025, and exceeding 50% thereafter. These levels were materially above the approximately 25% to 30% range Defendants themselves identified as typical for the category. Defendants thus knew that BellRing's reported growth was heavily dependent on elevated promotional activity that was not sustainable.

205. Moreover, as alleged in ¶¶81-83, Defendants knew that these levels of promotional activity were unsustainable based on BellRing's experience with promotions in 2021, which were "heavy on promotion" and had been "subsidizing volume." The economic effects of such promotions were also well-understood by Defendants, who have decades of experience in consumer goods. As alleged in ¶¶87-88, price discounts generate short-term increases in unit volume by accelerating purchases and shifting demand across periods, rather than creating durable increases in underlying consumption.

206. Because Defendants knew that BellRing's sales were being driven by massive and unsustainable promotions, and that any reduction in such promotions would negatively impact results, their warnings that changes in promotional activity merely "may" affect performance were materially misleading. BellRing failed to update its risk disclosures to reflect that these risks had already materialized.

**Any Purported Risk Warnings in BellRing's Class Period Forms 10-Q and 10-K Were Inadequate**

207. As alleged in ¶¶193-206, although BellRing's Class Period Forms 10-Q and 10-K—including the Company's filings for 3Q 2024, FY 2024, 1Q 2025, 2Q 2025, 3Q 2025, FY 2025, and 1Q 2026—contained purported risk warnings, those disclosures did not adequately warn investors of the true risks facing the Company. Instead, the risk disclosures were materially misleading because they: (i) described risks as hypothetical when, in fact, those risks had already materialized; and (ii) were not meaningful, as they consisted of vague, boilerplate statements that failed to disclose the specific, known adverse trends affecting BellRing's business, including retailer destocking following inventory hoarding, weakening consumer demand, and the Company's reliance on massive and unsustainable promotional activity to sustain reported sales.

## ADDITIONAL SCIENTER ALLEGATIONS

208. As alleged herein, Defendants acted with scienter because they knew, or recklessly disregarded, that their Class Period statements concerning BellRing's demand, consumption, shipments, inventory levels, promotional activity, competition, and guidance were materially false and misleading. Throughout the Class Period, Defendants repeatedly represented that BellRing closely monitored and relied upon detailed information concerning these same subjects, including retailer inventory levels, consumer demand trends, competitive dynamics, promotional activity, shipment patterns, and internal forecasts relating to BellRing's core product, Premier Protein. Defendants further portrayed BellRing as a data-driven company that actively tracked consumer behavior, retailer purchasing patterns, and market conditions in order to manage the business and forecast performance.

**Defendants Had Access to, and Reviewed, Near Real-Time Data Concerning Sales, Consumer Demand, Competitor Interactions, Promotional Activity, and Market Share**

209. Throughout the Class Period, Defendants had access to information directly contradicting their public statements. As alleged herein, Defendants regularly reviewed and relied upon contemporaneous business information, including third-party datasets such as Numerator and Circana, internal shipment and sales data, demand-planning materials, customer-level information, promotional tracking data, and internal forecasting analyses. This information showed, among other things, that: (i) retailers had accumulated elevated and unsustainable inventory positions after BellRing exited supply constraints and would eventually reduce orders as they optimized weeks of supply on hand; (ii) BellRing's reported shipment growth materially exceeded underlying consumer demand; (iii) Premier Protein consumption was weakening by at least 1Q 2025; (iv) Premier Protein was losing volume to competitors, including in BellRing's core club channel; and (v) BellRing was increasingly relying on elevated and unsustainable promotional activity to support reported sales.

210. Defendants' scienter is strongly supported by their own admissions that BellRing monitored the precise categories of information necessary to know the truth concerning the Company's demand trends, inventory conditions, promotional reliance, and competitive position. Throughout the Class Period and before it, Defendants repeatedly represented that BellRing tracked consumption, shipments, market share, competitive dynamics, promotional activity, and consumer behavior through Numerator and Circana. BellRing selected Numerator as its omnichannel purchase panel provider to obtain "consumer visibility and understanding," and BellRing's Chief Growth Officer stated that Numerator enabled BellRing to "identify emerging behaviors and trends" and "take decisive action." Davenport herself told investors that Numerator helped BellRing understand "purchasing patterns," "interactions with competitors," and "where

our growth trajectory is," and that these insights supported "day-to-day management" and forecasting. BellRing's investor presentations during the Class Period likewise repeatedly cited Numerator and Circana data concerning consumption trends, category growth, market share, and retailer activity.

211. Accordingly, Defendants did not merely have theoretical access to relevant information; they affirmatively represented that they relied on these datasets to assess demand and guide the business. Thus, the inference is not simply that Defendants could have known the truth, but that the very tools they invoked to support their public statements would have revealed it.

212. The inference of scienter is further strengthened by the nature of the data Defendants represented they used. The Numerator and Circana are specifically designed to provide near real time visibility into consumer purchasing behavior, retailer inventory trends, market share shifts, promotional intensity, and brand switching across channels, including BellRing's core club channel. As alleged herein, these same categories of data reflected deteriorating consumer demand trends, weakening category expansion and churn metrics, increased competitive pressure, and elevated promotional reliance during the Class Period. Because Defendants represented that they used these datasets to monitor demand and guide the business on a "day-to-day" basis, the adverse trends alleged herein would necessarily have been visible through the same data streams Defendants invoked to reassure investors about demand strength and growth sustainability. Under these circumstances, Defendants' statements that there was "no softness" in demand were not merely optimistic, but were made in the face of contemporaneous data reflecting contrary conditions.

**The Fraud Involved Premier Protein's Core Operations, About Which Defendants Held Themselves Out as Knowledgeable**

213. The inference of scienter is amplified by the fact that the alleged fraud concerned BellRing's core product, core channels, and core operating metrics. Premier Protein accounted for approximately 86% of BellRing's business during the Class Period. Likewise, the concealed issues concerned demand, consumption, shipments, inventory, promotions, and competition in key channels such as Costco, Walmart, and Sam's Club. These were the central drivers of BellRing's reported growth and the same topics Davenport and Rode addressed directly with investors during earnings calls. Under these circumstances, it is not plausible that Defendants were unaware of adverse information reflected in the same data streams and operational processes they emphasized as central to managing the business. Accordingly, the core operations doctrine further supports an inference that Defendants knew, or recklessly disregarded, facts contradicting their public statements.

214. Defendants' own statements further demonstrate that BellRing maintained structured, recurring processes through which detailed demand, shipment, customer, and competitive information was collected and elevated to senior leadership. As set forth in ¶¶45-54, Defendants repeatedly described using internal data and third-party datasets, including Numerator and Circana, to monitor consumption trends, competitive dynamics, and promotional activity and to guide day-to-day decision-making. Because these processes concerned BellRing's core products, core customers, and core operating metrics throughout the Class Period, Defendants necessarily continued to receive and monitor the same categories of information during the Class Period.

215. Defendants' understanding of promotions independently reinforces scienter. Davenport previously acknowledged that BellRing in 2021 had been "heavy on promotion" and

had been "subsidizing volume," and that typical category promotional activity was approximately 25% to 30% sold on deal. ¶¶81-83. These admissions show that Defendants understood elevated promotions could artificially support sales without reflecting durable consumer demand. Thus, when BellRing relied on abnormal promotional activity while continuing to assure investors about demand strength, Defendants knew, or were reckless in not knowing, that reported sales growth did not necessarily reflect sustainable consumption.

**The Timing of Defendants' False and Misleading Statements Support Scienter**

216. The timing and content of Defendants' statements further support scienter. In the days leading up to the Class Period, BellRing's stock precipitously declined. Between July 8, 2024 and August 5, 2024, BellRing's stock price fell from an opening price of $60.80 on July 8, 2024 to a closing price of $49.32 on August 5, 2024, an approximately 19% decline. This significant fall set the stage for the Defendants' stock inflation scheme, which began the next day.

217. On August 6, 2024, Defendants began falsely and misleadingly telling investors that sales were increasing because retailers' were hitting "target levels," "filling the gap of trade inventory," and reaching "adequate trade inventory." ¶¶99-104. Then, when Defendants had to admit the truth about retailer "hoarding" during the Company's May 2025 earnings call, Defendants immediately began making false and misleading statements during the same call concerning consumption and promotions. ¶¶128-139.

218. The beginning of both of these schemes thus coincided with a significant decline in the Company's stock price—approximately 19% between July 8, 2024 and August 5, 2024 and approximately 19% between May 5, 2025 and May 6, 2025.




**The Individual Defendants Knowingly or Recklessly Signed False Sarbanes-Oxley Certifications Attesting that They Personally Maintained and Promoted Effective Controls Over Financial Reporting**

219. The Individual Defendants' SOX certifications further support scienter because they attested to the accuracy of BellRing's disclosures and the effectiveness of its disclosure controls. Those certifications are probative here because the alleged misstatements concerned BellRing's core product, core operating metrics, and the same internal information that Defendants publicly represented BellRing used to manage demand, consumption, shipments, promotions, inventory, and competition.

**The Individual Defendants Had Strong Financial Motives to Inflate BellRing's Stock Price Based on the Unique Structure of Their Compensation**

*Davenport and Rode's Compensation*

220. The Individual Defendants were highly motivated to maximize BellRing's 2024 and 2025 share price because their compensation largely depended on it. Each of BellRing's annual proxies between 2022 and 2025 states that executive compensation "significantly skew[s] towards performance-based 'at-risk' compensation." In 2024, Davenport's compensation consisted of 66% performance-based restricted stock unit awards ("PRSUs"), 19% annual bonus, and 15% base salary. Likewise, Rode's compensation consisted of 41% PRSUs, 35% base salary, and 24% annual bonus. The following charts, from BellRing's 2024 annual proxy statement, set forth Davenport and Rode's compensation for the year.







221. Similarly, in 2025, Davenport's compensation consisted of 54% PRSUs, 18% annual bonus, 15% base salary, and 13% time-based restricted stock unit awards ("RSUs"). Likewise, Rode's compensation consisted of 34% PRSUs, 34% base salary, 23% annual bonus, and 9% RSUs. The following charts, from BellRing's 2025 annual proxy statement, set forth Davenport and Rode's compensation for the year.







222. These PRSUs – which made up the bulk of Davenport and Rode's compensation – were tied entirely to the Company's stock price. BellRing calculates PRSUs by calculating the increase in the Company's stock price over a three-year period and comparing it to a fixed set of competitors.[10] For Davenport and Rode, the three-year performance period for 2024 was November 11, 2021 through November 10, 2024. The three-year performance period for 2025 was November 11, 2022 through November 11, 2025.

223. If the change in BellRing's three-year stock price was below the 25th percentile versus competitors, the Defendants would receive no PRSUs. If the change in BellRing's three-year stock price was between the 25th and 50th percentile, the Defendants would receive 50% of the target PRSUs. If the change in BellRing's three-year stock price was between the 50th and

[10] Specifically, BellRing measures three-year total cumulative shareholder ("TSR") performance against the Russell 3000 Food Products companies. BellRing calculates the TSR using the difference between 30-day volume-weighted average price (VWAP) at the beginning of the performance period and the end of the performance period. BellRing then calculates the percentage increase or decrease between these two 30-day periods and compares the figure against competitors' TSRs for the same performance period.

75th percentile, the Defendants would receive 100% of their target PRSUs. If the change in BellRing's three-year stock price was between the 75th and 85th percentile, the Defendants would receive 200% of their target PRSUs. And if the change in BellRing's three-year stock price was above the 85th percentile, the Defendants would receive 260% of the target PRSUs. The below table from BellRing's annual proxy statement for 2022 sets forth the percentile rank and accompanying stock award applicable to 2024. BellRing used this same table for the stock award applicable to 2025.

| BRBR's Relative 3-Year TSR Percentile Rank | Vesting[(1)] |
|---|---|
| >85th | 260% of target |
| 75th | 200% of target |
| 50th | 100% of target |
| 25th | 50% of target |
| <25th | 0% of target |

224. Accordingly, by inflating BellRing's stock price in November 2024, near the beginning of the Class Period, Davenport stood to make as much as $5,739,500 in PRSUs and Rode stood to make as much as $1,318,200.[11] Likewise, by inflating the price of BellRing stock through November 2025, three months before the end of the Class Period, Davenport stood to make as much as $6,825,000 and Rode stood to make as much as $1,456,000.[12]

225. Davenport and Rode further profited immensely by artificially elevating BellRing's share price. Pursuant to BellRing's PRSU plan, in November 2024, BellRing awarded Davenport

[11] These numbers are calculated by multiplying the base, "target" vesting amount of $2,207,500 for Davenport and $507,000 for Rode in 2024 by the maximum multiplier of 2.6 (260%).

[12] These numbers are calculated by multiplying the base, "target" vesting amount of $2,625,000 for Davenport and $560,000 for Rode in 2025 by the maximum multiplier of 2.6 (260%).

120,843 shares of stock worth approximately ***$9.5 million***.[13] Davenport then immediately sold 61,244 of the shares – worth approximately ***$4.8 million*** – while the stock was artificially inflated from the scheme to pay her tax burden. Davenport thus received – tax free – approximately ***$4.7 million*** in PRSU compensation as a result of the scheme in 2024.

226. Likewise, pursuant to BellRing's PRSU plan, in November 2024, BellRing awarded Rode 27,750 shares of stock worth approximately ***$2.2 million***.[14] Rode then immediately sold 11,420 of the shares – worth approximately ***$897,612*** – while the stock was artificially inflated from the scheme to pay his tax burden. Rode thus received – tax free – approximately ***$1.3 million*** in PRSU compensation as a result of the scheme in 2024.

227. Similarly, pursuant to BellRing's PRSU plan, in December 2025, BellRing awarded Davenport 293,295 shares of stock worth approximately ***$9,059,882.55***.[15] Davenport then immediately sold 157,050 shares – worth approximately ***$4.85 million*** – while the stock was artificially inflated from the scheme to pay her tax burden. Davenport thus received – tax free – approximately ***$4.2 million*** in PRSU compensation as a result of the scheme in 2025.

---

[13] The $9.2 million award is in excess of what was permitted under the 2022 annual proxy, which set the formula for calculating Davenport's 2024 PRSU award. It appears that BellRing awarded Davenport extra shares of stock to cover tax liabilities so that her actual 2024 PRSU grant ($4.7 million) would be tax free.

[14] The $2.2 million award is in excess of what was permitted under the 2022 annual proxy, which set the formula for calculating Rode's 2024 PRSU award. It appears that BellRing awarded Rode extra shares of stock to cover tax liabilities so that his 2024 PRSU grant ($1.3 million) would be tax free.

[15] The $9 million award is in excess of what was permitted under the 2023 annual proxy, which set the formula for calculating Davenport's 2025 PRSU award. It appears that BellRing awarded Davenport extra shares of stock to cover tax liabilities so that her 2025 PRSU grant ($4.2 million) would be tax free.

228. Likewise, pursuant to BellRing's PRSU plan, in December 2025, BellRing awarded Rode 62,569 shares of stock worth approximately ***$1.9 million***.[16] Rode then immediately sold 26,616 of the shares – worth approximately ***$822,168***– while the stock was artificially inflated from the scheme to pay his tax burden. Rode thus received – tax free – approximately ***$1.1 million*** in PRSU compensation as a result of the scheme in 2025.

*Vitale's Compensation*

229. Similarly, Vitale's compensation served as strong motivation to artificially inflate the price of BellRing common stock. Based on BellRing's annual proxy filings, Vitale's ***entire*** compensation between 2022 and 2024 consisted solely of PRSUs.[17] BellRing further did not award Vitale any of the PRSUs in 2022 or 2023. Instead, BellRing deferred Vitale's entire PRSU award to February 2025 – approximately halfway through the Class Period. Vitale further had a powerful financial incentive to artificially inflate the price of BellRing common stock as of February 2025. BellRing agreed to pay Vitale as much as $26 million in PRSUs depending on the Company's stock price performance between April 5, 2022 and February 1, 2025.[18]

---

16 The $1.9 million award is in excess of what was permitted under the 2023 annual proxy, which set the formula for calculating Rode's 2025 PRSU award. It appears that BellRing awarded Rode extra shares of stock to cover tax liabilities so that his 2025 PRSU grant ($1.1 million) would be tax free.

17 In 2025, Vitale stepped down as Executive Chairman and continued solely as Chairman of the Board. In 2025, Vitale received 42% of his compensation from cash fees, 43.6% of his compensation from stock awards, and 14.1% of his compensation from other sources.

18 The $26 million number is calculated by multiplying the base, "target" vesting amount of $10 million for Vitale by the maximum multiplier of 2.6 (260%). The formula for calculating Vitale's PRSU grant was the same as that used for Davenport's and Rode's grants. The primary difference is that Vitale's performance period (April 2022 to February 2025) differed from Davenport and Rode's performance periods. In addition, Davenport and Rode were eligible for PRSU grants based on BellRing's fiscal year 2025 performance. Vitale was not eligible for PRSUs in 2025 because he stepped down from his position as Executive Chairman.

230. Vitale likewise profited immensely by artificially elevating BellRing's share price. Pursuant to BellRing's PRSU plan, in February 2025, BellRing awarded Vitale 780,000 shares of stock worth approximately ***$62 million***. Vitale then sold approximately ***$28 million*** of these shares – while the stock was artificially inflated from the scheme – between February 10 and February 25, 2025 to pay his tax burden. Vitale thus received – tax free – approximately ***$34 million*** in PRSU compensation as a result of the scheme.[19]

231. Tellingly, as set forth in ¶¶105-110, the Defendants only began partially disclosing the truth of the above-described retailer inventory scheme starting in May 2025 – less than three months after Vitale received his $34 million pay day.

**The Individual Defendants' Insider Sales During the Class Period Support Scienter**

232. Defendants' scienter is further supported by suspicious stock sales by Vitale, Davenport and Rode. Between February 10 and February 24, 2025, Vitale sold 368,334 shares of BellRing common stock for approximately $28.1 million in proceeds, at a weighted average price of approximately $76.26 per share, near Class Period highs. Although the Form 4 indicates that these sales were made to satisfy tax obligations in connection with RSU vesting, that explanation does not account for the timing, concentration, and magnitude of the transactions. Vitale liquidated all of these shares within a compressed two-week period, at peak prices, rather than over time, while, as alleged herein, BellRing was already experiencing weakening consumer demand, increasing competitive pressure, and reliance on elevated promotional activity – facts not disclosed

[19] Vitale's post-tax PRSU payments exceeded what Vitale was eligible for based on BellRing's 2022 annual proxy statement, which set forth the framework and formula for Vitale's payment in 2024. Based on the 2022 annual proxy statement, Vitale's "target" vesting was $10,000,000. Accordingly, if BellRing's three-year TSR was in the highest percentile, Vitale was eligible for $26,000,000 in compensation (260% of $10,000,000). However, BellRing paid Vitale PRSUs in excess of this figure for unknown reasons.

to investors. The decision to monetize a substantial block of shares at once, during this period and at these prices, supports a strong inference that Vitale was motivated to capitalize on BellRing's artificially inflated stock price before the market learned the truth about its deteriorating demand and competitive position.

233. Davenport's stock sales were likewise suspicious. In November 2024, BellRing awarded Davenport 120,843 shares of stock worth approximately $9.5 million. Davenport then immediately sold 61,244 of the shares – worth approximately $4.8 million – at a weighted average price of approximately $78.60 per share, near Class Period highs. Similarly, in December 2025, BellRing awarded Davenport 293,295 shares of stock worth approximately $9,059,882.55. Davenport then immediately sold 157,050 shares – worth approximately $4.85 million – at a weighted average price of approximately $30.89 per share, a price which was materially elevated due to Defendants' price inflation scheme. Although the Form 4 indicates that these sales were made to satisfy tax obligations in connection with RSU vesting, that explanation does not account for the timing, concentration, and magnitude of the transactions. Davenport liquidated all of these shares within a one-day period, at peak prices or materially elevated prices, rather than over time, while, as alleged herein, BellRing was already experiencing weakening consumer demand, increasing competitive pressure, and reliance on elevated promotional activity – facts not disclosed to investors. The decision to monetize a substantial block of shares at once, during this period and at these prices, supports a strong inference that Davenport was motivated to capitalize on BellRing's artificially inflated stock price before the market learned the truth about its deteriorating demand and competitive position.

234. Rode's stock sales were similarly suspicious. In November 2024, BellRing awarded Rode 27,750 shares of stock worth approximately $2.2 million. Rode then immediately sold

11,420 of the shares – worth approximately $897,612 – at a weighted average price of approximately $78.60 per share, near Class Period highs. Similarly, in December 2025, BellRing awarded Rode 62,569 shares of stock worth approximately $1.9 million. Rode then immediately sold 26,616 – worth approximately $822,168 – at a weighted average price of approximately $30.89 per share, a price which was materially elevated due to Defendants' price inflation scheme. Although the Form 4 indicates that these sales were made to satisfy tax obligations in connection with RSU vesting, that explanation does not account for the timing, concentration, and magnitude of the transactions. Rode liquidated all of these shares within a one-day period, at peak prices or materially elevated prices, rather than over time, while, as alleged herein, BellRing was already experiencing weakening consumer demand, increasing competitive pressure, and reliance on elevated promotional activity – facts not disclosed to investors. The decision to monetize a substantial block of shares at once, during this period and at these prices, supports a strong inference that Rode was motivated to capitalize on BellRing's artificially inflated stock price before the market learned the truth about its deteriorating demand and competitive position.

235. Davenport's Rule 10b5-1 trading activity further supports a strong inference of scienter. On February 26, 2025, Davenport adopted a Rule 10b5-1 trading plan at a time when, as alleged herein, BellRing was already experiencing weakening consumer demand, increasing competitive pressure, and reliance on elevated promotional activity, trends reflected in internal and third-party data, including Numerator and Circana, that Defendants routinely monitored and relied upon to manage the business. The timing of this plan adoption is highly suspicious. By late February 2025, BellRing's internal data was already showing the very trends that Defendants would later attribute to slowing growth, increased competition, and heightened promotional activity. Yet Defendants did not disclose those trends to the market and, instead, continued in the

following months to assure investors, including in May 2025, that there was no "softness" in demand. Davenport thus adopted her trading plan at a time when the Company's internal data diverged from its public messaging.

236. Davenport's subsequent sale of shares on August 1, 2025, pursuant to this plan, shortly before BellRing disclosed adverse developments concerning demand, competition, and promotional activity, further supports this inference. This sequence, adoption of a trading plan after adverse trends had materialized internally but before they were disclosed, followed by continued reassuring statements to investors and then sales before corrective disclosures, supports a strong inference that Davenport sought to monetize BellRing stock at artificially inflated prices while shielding those sales through a prearranged plan.

**Davenport Abruptly Announced Her Resignation as the Scheme Unraveled**

237. Davenport's February 2026 retirement announcement further supports the inference of scienter when considered with the other allegations herein. On February 3, 2026, the same day BellRing disclosed disappointing 1Q 2026 results and further reduced its 2026 guidance, the Company announced that Davenport had "decided to retire," effective upon the earlier of the appointment of a new CEO or September 30, 2026. BellRing further disclosed that it had only commenced an external search for a successor and had not identified or appointed any replacement at the time. Although the Company characterized Davenport's departure as a retirement and transition, and provided that she would remain in her role during the transition and thereafter in an advisory capacity, Davenport was only 52 years old. Moreover, the Company previously experienced significant stock price declines between approximately August 2021 and September 2022 due to management's inability to grow manufacturing capacity, but this poor performance did not result in Davenport's resignation. Accordingly, simple declines in financial performance or innocent management missteps are not a plausible explanation for Davenport's decision to

resign. Viewed in context, particularly the timing of the announcement, the absence of a named successor, and Defendants' admitted access to contemporaneous demand, inventory, promotional, and competitive data, the circumstances of Davenport's departure further support the inference that Defendants knew, or recklessly disregarded, facts contradicting their prior public statements.

238. Taken together, these allegations give rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference.

## LOSS CAUSATION/ECONOMIC LOSS

239. During the Class Period, as detailed herein, Defendants deceived the market and artificially inflated the price of BellRing common stock through materially false and misleading statements and omissions concerning BellRing's demand, consumption, shipments, retailer inventory levels, promotional activity, competition, and guidance. Defendants' false and misleading statements and omissions caused BellRing common stock to trade at artificially inflated prices throughout the Class Period. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of BellRing common stock fell as the prior artificial inflation came out. As a result of their purchases or acquisitions of BellRing common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

240. Defendants' false and misleading statements and omissions, which as alleged above were made knowingly or with deliberate recklessness, had the intended effect and actual result of causing BellRing common stock to trade at artificially inflated levels throughout the Class Period.

241. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of BellRing's demand, consumption, retailer inventory levels, promotional activity, competitive position, and growth prospects. As the true state of BellRing's business was revealed to the market, and as the risks concealed by Defendants' misrepresentations

and omissions materialized through a series of partial disclosures, the price of BellRing common stock declined, removing the prior artificial inflation.

242. BellRing common stock, however, remained artificially inflated after each partial disclosure because Defendants continued to conceal the full truth and continued to make materially false and misleading statements and omissions, as alleged herein. Among other things, Defendants continued to deny weakening consumption, minimize competition, characterize promotions as merely incremental, and conceal that BellRing's reported sales growth was materially supported by retailer inventory build and abnormal promotional activity.

243. The declines in the price of BellRing common stock after the disclosures came to light were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market and/or the materialization of the risks concealed by Defendants. The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

244. The disclosures that corrected the market price of BellRing shares are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

245. On May 6, 2025, the Individual Defendants held an earnings call for 2Q 2025 and admitted that retailers had been "hoarding" inventory since summer 2024, that retailers were ending the practice, that retailers would purchase less product while they sold down existing inventory, and that this decline in sales was "expected to be a mid-single-digit headwind to our third quarter growth."

246. In response to this news, the price of BellRing common stock declined $14.88 per share, or approximately 19%, from $78.43 per share on May 5, 2025, to close at $63.55 per share on May 6, 2025, on unusually heavy trading volume.

247. BellRing common stock, however, remained artificially inflated because Defendants continued to conceal the true nature and extent of BellRing's sales and operational problems. During the call, an analyst questioned whether such significant destocking reflected weakening consumption, noting that such pullbacks typically occur only where there is "deceleration in consumption or disappointment in consumption from that retailer side." Defendants denied any such weakness. Davenport stated that there was "really no change in consumption" and "absolutely, no softness, no concern around consumption," and further represented that "our outlook and consumption remain resilient and strong." Defendants also falsely stated that promotions were limited to only the month of March during the quarter, when in reality "major club promotions" took place throughout the entirety of the quarter.

248. Then, on August 4, 2025, after market hours, BellRing reported its 3Q 2025 financial results in a press release that it filed on Form 8-K with the SEC and held an earnings conference call the following morning, August 5, 2025, to discuss the results. In the press release, the Company revealed a disappointing new 2025 sales outlook, stating "BellRing management has narrowed its fiscal year 2025 outlook for net sales to [a] range between $2.28-$2.32 billion[.]"

249. During the associated earnings call, Davenport attributed the reduced outlook to increased competition, stating that "success attracts competition" and that new protein RTDs had entered the category. BellRing also disclosed that it had relied on "major club promotions" dating back to at least January 2025 in the investor presentation accompanying the earnings call.

250. In response to this news, the price of BellRing common stock declined $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to close at $36.18 per share on August 5, 2025, on unusually heavy trading volume.

251. BellRing common stock, however, remained artificially inflated because Defendants continued to misrepresent the timing and extent of the competition affecting the Company's sales. Among other things, Defendants characterized the increased competition as a "unique scenario" limited to Costco, thereby concealing that competitive pressures were broader and more persistent. Defendants further characterized promotional activity as merely "incremental" and returning back to "historical" levels, thereby concealing the extent to which promotions were artificially and temporarily propping up sales.

252. Then, on November 17, 2025, after market hours, BellRing reported its fiscal 2025 financial results and provided initial 2026 guidance. During the November 18, 2025 earnings call, Defendants acknowledged a "more competitive environment" and guided to 2026 net sales growth of only 4% to 8%, explaining that sales would be "modestly below" long-term expectations due to "near-term competitive dynamics" and a projected decline in first quarter net sales. Defendants further acknowledged that the category is "fairly low promotion," typically "about 25% to 30% sold on deal."

253. In response to this news, the price of BellRing common stock declined sharply intraday, falling to a low of $22.45 per share on November 18, 2025, from a prior closing price of $25.62 per share on November 17, 2025, before recovering to close at $26.26 per share, on unusually heavy trading volume.

254. BellRing common stock, however, remained artificially inflated because Defendants continued to misrepresent the timing and extent of the competition affecting the

Company's sales. Among other things, Defendants continued to describe recent performance as "strong, strong growth" and represented that BellRing maintained a "clear position" relative to competitors, while characterizing promotional activity as merely "incremental," when in fact it was materially elevated.

255. On February 3, 2026, after the close of trading, BellRing reported its fiscal 1Q 2026 financial results. During the February 3, 2026 earnings call, Defendants further reduced 2026 guidance to 4% to 6% net sales growth and attributed the decline to "more frequent promotional events" from competitors. Defendants also emphasized that BellRing had chosen not to repeat prior promotional activity.

256. Defendants further acknowledged that the category is "usually not that promotionally driven," typically "about 25% to 30% sold on deal," while attributing increased promotional activity to so-called "insurgent brands" seeking to gain share. In doing so, Defendants attempted to shift blame to competitors for elevated promotions, despite BellRing's own reliance on similar promotional activity during the Class Period to support reported sales.

257. On this news, the price of BellRing stock declined $3.51 per share, or nearly 14%, from a close at $24.39 per share on February 2, 2026, to close at $20.88 per share on February 3, 2026, on unusually heavy trading volume.

258. BellRing common stock, however, remained artificially inflated because, among other things, Defendants continued to minimize the negative impact from competition by characterizing it as "small" and blaming softer consumption primarily on a "delay" rather than revealing the magnitude of the competition faced by the Company.

259. Defendants then finally revealed the truth in connection with BellRing's financial results for the second quarter of fiscal 2026 ("2Q 2026"). On May 5, 2026, before the open of

trading, BellRing reported its 2Q 2026 financial results in a press release furnished to the SEC on a Form 8-K (the "May 2026 Form 8-K").

260. The same day, during the May 5, 2026 earnings call, Davenport revealed that "[o]ur second quarter results came in below our expectations, and we are disappointed with our results. We faced a challenging operating environment, as multiple dynamics pressured our financial results. While net sales grew 2%, which was only modestly below expectations, the mix of our revenues differed meaningfully from both our forecast and what we've seen historically." Davenport then revealed the full extent to which BellRing's consumption had long been weakening as a result of increased competition: "***I think our latest estimates were internally somewhere around 40 new competitors over the last 18 months. So it's tremendous. And as the number one player, we are going to get affected by that***."

261. Davenport further stated that reliance on elevated promotions was unsustainable – despite BellRing's undisclosed practice of selling upwards of 57% of volume on promotion in FY 2025. During the earnings call, Davenport criticized competitors for selling just 27% of their products on promotion. As Davenport stated, "smaller entrants[] continued to invest aggressively to gain traction" and "[a]s a result, 27% of RTD shake category volumes were sold on price promotion, up 8 percentage points versus last year and a meaningful step-up from Q1." Davenport further stated that selling 27% of products on promotion was a "big number" and that competitors were "not acting very rationally." Davenport further added BellRing "did not add any more events to compete."

262. On this news, the price of BellRing stock declined $6.73 per share, or nearly 39%, from a close at $17.36 per share on May 4, 2026, to close at $10.63 per share on May 5, 2026, on unusually heavy trading volume.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

263. At all relevant times, the market for BellRing common stock was an efficient market for the following reasons, among others:

a. BellRing common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, BellRing filed periodic public reports with the SEC and the NYSE; and

c. BellRing regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

264. Under these circumstances, all purchasers or acquirers of BellRing common stock during the Class Period suffered similar injury through their purchase(s) of BellRing common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

265. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

266. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all purchasers or acquirers of BellRing common stock between August 6, 2024 and May 4, 2026, inclusive, who were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

267. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BellRing common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from information and records maintained by BellRing or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

268. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

269. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

270. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and contingent liabilities of BellRing;

c. whether the Individual Defendants and the Company acted knowingly or recklessly in issuing false and misleading financial statements;

d. whether the prices of BellRing common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

e. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

271. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

272. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

273. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

274. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

275. The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the BellRing's common stock during the Class Period.

276. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of BellRing were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or

receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

277. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

278. As a result of the foregoing, the market price of BellRing's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of BellRing's common stock during the Class Period in purchasing BellRing's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

279. Had Plaintiff and the other members of the Class been aware that the market price of the Company's common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

280. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

281. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

282. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

283. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company as alleged herein.

284. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

285. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

286. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

287. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B. Awarding Plaintiff and other members of the Class damages together with interest thereon;

C. Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D. Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: May 8, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
MATHEW ANDREWS
CRISTELLE RABBAN

*/s/ Mathew Andrews*
MATHEW ANDREWS

420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
mandrews@rgrdlaw.com
crabban@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DANIELLE S. MYERS
MICHAEL ALBERT
KENNETH P. DOLITSKY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
dmyers@rgrdlaw.com
malbert@rgrdlaw.com
kdolitsky@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

INDIANA PUBLIC RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Henry v. Futu Holdings Limited*, No. 2:23-cv-03222 (D.N.J.)
*Lemm v. New York Community Bancorp*, No. 1:24-cv-00903 (E.D.N.Y.)
*In re Agilon Health, Inc. Securities Litigation*, No. 1:24-cv-00297 (W.D. Tex.)
*Roofers Local No. 149 Pension Fund v. GSK plc*, No. 2:25-cv-00618 (E.D. Pa.)
*City of St. Clair Shores Police and Fire Retirement System v. Lineage, Inc.*, No. 2:25-cv-12383 (E.D. Mich.)
*In re Lantheus Holdings, Inc. Sec. Litig.*, No. 1:25-cv-07491 (S.D.N.Y.)
*In re Inspire Medical Systems, Inc. Sec. Litig.*, No. 1:25-cv-10620 (S.D.N.Y.)

(b) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Troike v. Boston Scientific Corporation*, No. 4:26-cv-40075 (D. Mass.)

(c) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Indiana Public Retirement System v. Rivian Automotive, Inc.*, No. 2:24-cv-04566 (C.D. Cal.)
*Cap v. CarMax, Inc.*, No. 1:25-cv-03602 (D. Md.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of May, 2026.

INDIANA PUBLIC RETIREMENT SYSTEM

By: Signed by: Jeffrey M. Gill
296FE2138E584D2...
Jeffrey M. Gill, General Counsel



BELLRING

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/21/2024 | 1,069 | $56.13 |
| 09/20/2024 | 140 | $60.47 |
| 09/20/2024 | 190 | $60.47 |
| 12/20/2024 | 220 | $76.10 |
| 12/20/2024 | 320 | $76.10 |
| 02/25/2025 | 30 | $72.22 |
| 02/25/2025 | 7,271 | $72.40 |
| 02/25/2025 | 9,129 | $72.37 |
| 02/25/2025 | 15,946 | $72.43 |
| 02/25/2025 | 17,554 | $72.37 |
| 03/03/2025 | 449 | $73.11 |
| 03/19/2025 | 360 | $70.18 |
| 03/21/2025 | 100 | $70.65 |
| 03/21/2025 | 250 | $70.65 |
| 03/27/2025 | 41 | $73.98 |
| 03/31/2025 | 21,318 | $74.45 |
| 04/14/2025 | 40 | $74.39 |
| 05/08/2025 | 854 | $61.32 |
| 05/08/2025 | 2,219 | $61.11 |
| 05/08/2025 | 3,444 | $61.58 |
| 05/16/2025 | 110 | $65.89 |
| 05/16/2025 | 160 | $65.89 |
| 05/16/2025 | 495 | $65.83 |
| 05/16/2025 | 1,371 | $65.71 |
| 05/19/2025 | 149 | $65.40 |
| 05/19/2025 | 1,246 | $65.78 |
| 07/08/2025 | 70 | $57.51 |
| 07/08/2025 | 130 | $57.51 |
| 07/17/2025 | 120 | $57.20 |
| 07/22/2025 | 100 | $55.29 |
| 07/22/2025 | 120 | $55.29 |
| 09/19/2025 | 290 | $36.00 |
| 09/19/2025 | 330 | $36.00 |
| 09/26/2025 | 650 | $36.49 |
| 09/26/2025 | 1,492 | $36.56 |
| 09/26/2025 | 3,449 | $36.80 |
| 10/27/2025 | 2,991 | $31.92 |
| 12/19/2025 | 320 | $29.04 |
| 12/19/2025 | 350 | $29.04 |
| 01/07/2026 | 13,348 | $23.71 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 08/09/2024 | 70 | $54.55 |
| 09/04/2024 | 70 | $56.17 |

| | | |
|---|---|---|
| 09/30/2024 | 60 | $60.72 |
| 10/15/2024 | 110 | $65.82 |
| 10/28/2024 | 840 | $65.10 |
| 11/12/2024 | 270 | $71.78 |
| 01/27/2025 | 1,300 | $79.17 |
| 02/04/2025 | 30 | $76.36 |
| 02/06/2025 | 30 | $77.02 |
| 03/07/2025 | 70 | $68.97 |
| 03/11/2025 | 73 | $64.70 |
| 03/11/2025 | 909 | $64.33 |
| 03/11/2025 | 2,094 | $65.12 |
| 03/27/2025 | 3,842 | $73.98 |
| 04/03/2025 | 334 | $74.51 |
| 04/03/2025 | 1,551 | $74.41 |
| 04/04/2025 | 1,469 | $69.90 |
| 04/22/2025 | 3,967 | $75.29 |
| 06/11/2025 | 236 | $60.45 |
| 06/11/2025 | 852 | $61.12 |
| 06/11/2025 | 2,745 | $60.44 |
| 06/11/2025 | 4,041 | $60.62 |
| 06/27/2025 | 710 | $58.54 |
| 06/27/2025 | 1,270 | $58.54 |
| 07/02/2025 | 67 | $57.74 |
| 07/15/2025 | 130 | $56.42 |
| 08/21/2025 | 150 | $39.78 |
| 10/24/2025 | 220 | $33.05 |
| 12/17/2025 | 3,332 | $30.64 |
| 12/17/2025 | 4,981 | $30.41 |
| 12/17/2025 | 5,592 | $30.15 |
| 01/13/2026 | 150 | $23.08 |
| 03/20/2026 | 209 | $17.22 |
| 03/20/2026 | 721 | $17.22 |
| 03/25/2026 | 4,394 | $15.54 |
| 03/25/2026 | 16,766 | $15.50 |
| 03/25/2026 | 18,327 | $15.43 |
| 03/26/2026 | 2,403 | $15.21 |
| 03/26/2026 | 4,104 | $15.03 |
| 03/26/2026 | 4,574 | $15.29 |
| 03/27/2026 | 765 | $15.00 |
| 03/27/2026 | 3,811 | $14.94 |
| 03/27/2026 | 7,728 | $14.53 |
| 03/27/2026 | 8,327 | $15.01 |

*Opening position of 30,063 shares.

**Bond**

| Date Disposed | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 02/05/2025 | 7.0% due 03/15/2030 | 1,660,000 | $103.50 |

*Opening position of 1,660,000 notes for 7.0%-03/15/2030, 07831CAA1.

Prices listed are rounded to two decimal places.